# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 03-CR-0723 (JFB) (ETB)

---

UNITED STATES OF AMERICA

VERSUS

DOV SHELLEF,

Defendant.

---

**MEMORANDUM AND ORDER**
August 5, 2010

---

JOSEPH F. BIANCO, District Judge:

Defendant Dov Shellef (hereinafter "defendant" or "Shellef") was convicted following a jury trial on all counts of an 86-count indictment, alleging: conspiracy to defraud the government, 18 U.S.C. § 371; filing a false tax return, 26 U.S.C. § 7206(1); wire fraud, 18 U.S.C. § 1343; and money laundering, 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(A)(ii), (a)(1)(B)(i). All of the charges relate to a scheme by defendant to avoid paying excise taxes on CFC-113, an industrial chemical. Before the Court is defendant's motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or for a new trial under Rule 33. For the reasons set forth below, defendant's Rule 29 motion is granted in part and denied in part. Specifically, the Court concludes that the evidence was insufficient to support the conviction on the money laundering charged in Counts 46-50, 52-63, 65-68, 70-75, and 77-82 because the counts were duplicative of

several wire fraud counts and the evidence was insufficient to show that those transactions involved the proceeds of earlier unlawful activity. The evidence was sufficient to support the jury's verdict on all of the other counts, and defendant's motion, therefore, is denied in all other respects. Defendant's motion for a new trial under Rule 33 is denied.

As set forth in more detail below, CFC-113 is a highly regulated industrial chemical. The manufacturer of that chemical is required to pay excise taxes on sales of the material unless: (1) the material is sold for export, or (2) the material is recycled or "reclaimed." In Count One of the Indictment, Shellef is charged with conspiring to defraud the United States with respect to the collection of excise taxes on CFC-113. There was evidence presented at trial that Shellef agreed with coconspirator William Rubenstein (hereinafter "Rubenstein") to avoid paying excise taxes on CFC-113 that they had purchased from two manufacturing companies, Elf Atochem and Allied Signal.

Although the material was purchased tax-free for export, Shellef and Rubenstein eventually worked together to sell the material domestically without telling the manufacturers or paying the excise taxes themselves. For the reasons set forth below, the evidence was sufficient to support the jury's verdict of guilty on Count One.

In Count Two of the Indictment, Shellef is charged with willfully filing a false tax return under 26 U.S.C. § 7206(1). There was evidence presented at trial that Shellef did not report as income on his company's 1999 tax return any of the money received on the domestic sales of Allied Signal CFC-113. Although he provided his accountant with various records to aid in the preparation of the return, he did not disclose to his accountant any of this income, nor did he disclose to his accountant that he had certain bank accounts that held this income. Thus, the Court concludes that the evidence was sufficient to support the jury's verdict of guilty on Count Two.

In Counts 3-45 of the Indictment, Shellef is charged with wire fraud in connection with his purchase of CFC-113 from Allied Signal. The contract between Shellef and Allied provided that Shellef was to export the material to a designated area. Because the material was sold for export, Allied Signal did not charge Shellef with the cost of any excise taxes. The contract provided, however, that if any unanticipated taxes became due, Allied Signal had the right to collect the amount of those taxes from Shellef. In November 1998, Shellef reaffirmed his obligation to export the material, even though he had already begun selling the material domestically and continued to do so. There was evidence presented at trial that Shellef never told Allied about the domestic sales and never paid the taxes himself. For the reasons set forth below, the evidence was sufficient to support the jury's verdict of guilty on Counts 3-45.

Finally, Shellef was charged with multiple counts of money laundering in Counts 46-86. However, the financial transactions charged as money laundering in Counts 46-50, 52-63, 65-68, 70-75, and 77-82 are also charged as wire fraud in earlier counts of the Indictment. Defendant argues that these alleged money laundering transactions did not, by definition, involve the proceeds of unlawful activity because those same transactions were alleged to generate the unlawful proceeds in the first place. For the reasons set forth below, the Court agrees with defendant and concludes that the evidence was insufficient to support the conviction of defendant on these counts. The remaining money laundering charges, Counts 51, 64, 69, 76, and 83-86, involve placing the proceeds of earlier wire fraud into bank accounts, including foreign bank accounts, about which Shellef did not tell his accountant. Shellef did not report any of the money involved in these transactions in his company's 1999 corporate tax return. Because there was sufficient evidence for the jury to rationally conclude that Shellef engaged in these transactions with the purpose of concealing the attributes of the funds involved and with the purpose of committing tax fraud, the Court denies defendant's motion with respect to these counts.

The Court also concludes that none of the alleged errors at trial, whether taken individually or collectively, warrant a new trial under Rule 33.

## I. BACKGROUND

### A. The Trial Evidence

Familiarity with the trial record is presumed. The Court summarizes the evidence relevant to the instant motion *infra* in connection with discussion of the specific counts of the Indictment. Because all of the counts relate to the collection of excise taxes on CFC-113, the Court briefly describes here the regulatory framework for that chemical. As the Second Circuit has explained:

> CFC-113 is a highly regulated, ozone depleting industrial solvent commonly used to remove grease from metal. Global regulation of CFC-113 began in earnest following the ratification of the Montreal Protocol on Substances that Deplete the Ozone Layer (the "Montreal Protocol") in 1987. . . . Pursuant to the Montreal Protocol, Congress sharply limited American production of CFC-113 as part of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* The Act implemented a phased ban . . . of the "production and consumption" of the substance in the United States. *See* 42 U.S.C. § 7671c. Previously stockpiled CFC-113 could, however, still lawfully be used in the United States. As an incentive for discontinuance of such use, Congress imposed an excise tax on any CFC-113 "sold or used by the manufacturer . . . thereof." *See* 26 U.S.C. § 4681(a)(1) (imposing a tax on sales of ozone-depleting chemicals); 26 U.S.C. § 4682(a)(2) (including CFC-113 within the definition of ozone-depleting chemicals).

*United States v. Shellef*, 507 F.3d 82, 89 (2d Cir. 2007).

There are two exceptions to the application of the excise tax that are relevant to this case. First, the excise tax does not apply to "sale[s] by the manufacturer or producer of [CFC-113] for export, or for resale by the purchaser to a second purchaser for export." 26 U.S.C. § 4662(e)(1)(A). In order to qualify for the export exemption, parties must meet various procedural requirements, which are discussed in more detail *infra*. Typically, when a manufacturer sells CFC-113 to a purchaser who plans to sell the material domestically, the manufacturer pays the excise tax and passes that cost on to the purchaser. (1/11/10 Trial Transcript (hereinafter "Tr.") 1579-80.)[1]

Second, the excise tax does not apply to CFC-113 that has been "diverted or recovered in the United States as part of a recycling process (and not as part of the original manufacturing or production process)." 26 U.S.C. § 4682(d)(1). The tax code does not define the phrase "recycling process." The industry generally refers to CFC-113 that has been used and is then recycled as "reclaimed." (*See, e.g.*, 12/15/09 Tr. 104-05; 12/22/09 Tr. 884.) The industry generally refers to CFC-113 that has never been used as "virgin." (*See, e.g.*, 12/15/09 Tr. 102-04; 12/22/10 Tr. 868.)

### B. Procedural History

Defendant was initially charged in a 91-count indictment on June 24, 2003. Following a jury trial in June-July 2005 before the Honorable Joanna Seybert, United States

---

[1] There appears to be a discrepancy in the page numbering of the trial transcripts in this case. To alleviate any confusion, the Court includes a reference to the date along with the page number for each citation to the transcript.

District Judge, defendant was convicted, along with co-defendant William Rubenstein, of all counts. Both Shellef and Rubenstein appealed their convictions. The Second Circuit held that certain tax charges against Shellef were improperly joined with the other charges against both defendants under Rule 8 of the Federal Rules of Criminal Procedure. *See United States v. Shellef*, 507 F.3d 82, 88 (2d Cir. 2007). The Second Circuit also held that the joinder of Shellef and Rubenstein as defendants was improper. *See id.*[2] Familiarity with that decision is presumed.

The case was remanded to the district court on March 5, 2008, and was reassigned to the Honorable Thomas C. Platt, Senior United States District Judge. On June 17, 2009, the case was reassigned to the undersigned. The Indictment was reduced to 86 counts to eliminate the portions of the Indictment rejected by the Second Circuit. (*See* Govt. Letter, Dec. 31, 2009, Dkt. 384.) The Court denied defendant's motion to dismiss the Indictment.

A five-week jury trial was held beginning on December 15, 2009 on the 86-count Indictment. The government introduced numerous documents as well as testimony from several witnesses. Pursuant to a plea agreement executed after the Second Circuit's decision in this case, defendant's coconspirator, William Rubenstein, testified for the government during its case in chief. (*See* 12/22/09 Tr. 838-39; Govt. Ex. 3000.) At the close of the government's case in chief on January 14, 2010, defendant moved for a

judgment of acquittal on all counts pursuant to Rule 29. (*See* 1/14/10 Tr. 2109-16.) The Court reserved decision on the motion. On January 27, 2010, the jury returned a verdict of guilty on all counts.

On April 2, 2010, defendant filed a renewed motion for a judgment of acquittal on all counts pursuant to Rule 29. In the alternative, defendant moved for a new trial under Rule 33. The government submitted its opposition on April 16, 2010. Defendant submitted a reply on April 26, 2010. Oral argument was held on May 26, 2010. The Court has fully considered the submissions of the parties.

## II. LEGAL STANDARD

### A. Rule 29

Pursuant to Rule 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). As the Second Circuit recently explained, "[f]or a defendant who challenges the sufficiency of the evidence to support his conviction, our standard of review poses high obstacles. In reviewing such a challenge, we 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor.'" *United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010) (quotation omitted); *see also United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008); *accord United States v. Pipola*, 83 F.3d 556, 564 (2d Cir. 1996) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

The standard under Rule 29, as articulated by the United States Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

---

[2] Although not necessary to decide the appeal, the Second Circuit also provided guidance for the district court on re-trial with respect to some of the issues in this case. *Shellef*, 507 F.3d at 88, 103-10.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *Lorenzo*, 534 F.3d at 159; *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006); *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). In other words, "'[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Temple*, 447 F.3d at 136 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).

It is important to emphasize that, in evaluating the evidence under this standard, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Florez*, 447 F.3d 145, 154-55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *Guadagna*, 183 F.3d at 130 (holding that court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury" (internal quotation marks omitted; alterations in original)).

Therefore, viewing the evidence in the light most favorable to the government means "drawing all inferences in the government's favor and deferring to the jury's assessments

of the witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999) (internal quotation marks omitted); *accord United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own."). In examining the sufficiency of the evidence, the Court also should not analyze pieces of evidence in isolation, but rather must consider the evidence in its totality. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *see also Guadagna*, 183 F.3d at 130 (holding that sufficiency test must be applied "to the totality of the government's case and not to each element, as each fact may gain color from others"). Finally, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *Lorenzo*, 534 F.3d at 159 (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)); *see also Irving*, 452 F.3d at 117 ("A jury may convict on circumstantial evidence alone."); *accord Jackson*, 335 F.3d at 180; *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

In short, "'[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that 'either of the two results, a reasonable doubt or no reasonable

doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Temple*, 447 F.3d at 137 (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)) (internal quotation marks omitted; alteration in original). On the other hand, "'in passing upon a motion for directed verdict of acquittal, . . . if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted.'" *Temple*, 447 F.3d at 137 (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

B. Rule 33 Motion

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). As the Second Circuit has explained, "[t]his rule 'confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir 1992)); *see also United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) ("[A] new trial is proper when a district court 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" (quoting *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998))). "The grant of a Rule 33 motion requires 'a real concern that an innocent person may have been convicted.'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). The Court should "exercise Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Cote*, 544 F.3d at 101 (quoting *Sanchez*, 969 F.2d at

1414). "[A] motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Landau*, 155 F.3d at 104 (citation omitted)). However, the Court "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *Sanchez*, 969 F.2d at 1414 (quotation omitted)). In determining whether to grant a new trial, the trial court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001).

III. DISCUSSION

The Court considers the charged counts in turn below.

A. Count One:
Conspiracy to Defraud
the United States

In Count One of the Indictment, defendant Dov Shellef is charged with conspiring to defraud the United States under 18 U.S.C. § 371. Specifically, the Indictment alleges that Shellef engaged in a conspiracy with William Rubenstein to obstruct the collection of excise taxes on the sale of CFC-113. For the reasons set forth below, the Court concludes that the evidence was sufficient for the jury to rationally find defendant guilty of Count One of the Indictment.

### 1. Factual Background[3]

#### a. Elf Atochem Material

In 1995, William Rubenstein purchased approximately 200,000 pounds of CFC-113 from a company called Elf Atochem. (12/11/09 Tr. 865-70.) Defendant Dov Shellef was a ten percent partner with Rubenstein in the deal. (*Id.* at 874-75.) Rubenstein and Shellef had done business before and had known each other since about 1980. (*Id.* at 851-52.) At the time of the purchase, Rubenstein intended to export the material, mostly to Israel, and told Elf Atochem that this was his intention. (*Id.* at 869.) Rubenstein did not believe that any excise tax would be paid on the material because he said he was going to export it. (*Id.* at 871-72.) Rubenstein told Shellef that, because he had filled out export forms for the material, no excise tax would be paid. (*Id.* at 876-77.)

Rubenstein understood that the Elf Atochem CFC-113 had never been used before and, therefore, was "virgin" material. (*Id.* at 868.) Although it was virgin, the material had been mixed with some small percentage of alcohol during the manufacturing process. (*Id.* at 867.) In 1995, Shellef told Rubenstein that the alcohol could easily be removed by a water wash process. (*Id.* at 867.) Shellef also told Rubenstein that by removing the alcohol, the material would be considered "reclaimed" and, therefore, would be exempt from the excise tax. (*Id.* at 877.) Rubenstein did not believe, based on his business experience, that such a process

rendered the virgin CFC reclaimed (*Id.* at 879-84), but there is no evidence that he told Shellef about this belief. There was considerable evidence that the industry considered material "reclaimed" and tax-exempt only if various impurities had been removed from already-used CFC-113, which the Elf Atochem material was not. (*See* 12/15/09 Tr. 104-05; 12/21/09 Tr. 527-28, 578-80; 12/22/09 Tr. 879-84, 891-92; 1/7/10 Tr. 1429.)

In about late 1996, Rubenstein stopped exporting Elf Atochem CFC-113 because there was no longer a demand for the product. (12/22/09 Tr. 898.) At the time, he had about 30,000 pounds of the material remaining, which he stored in his warehouse in Bayonne, New Jersey. (*Id.* at 898-900.) In the summer of 1997, Shellef told Rubenstein that he had some customers in California who would purchase the product.[4] (*Id.* at 900; 12/23/09 Tr. 926-27.) Shellef knew that no excise tax had been paid on the Elf Atochem material. (12/22/09 Tr. 904.) Rubenstein was not "happy" about selling the material domestically because he had told Elf Atochem he was selling it for export, but he nevertheless wanted to "get rid of" the material. (12/22/09 Tr. 900.) Therefore, Rubenstein agreed to sell the material to Shellef's company, Poly Systems USA, which, in turn, sold the material to Shellef's domestic customers. (*Id.* at 900-03.) Rubenstein did not tell Elf Atochem that he was no longer exporting because he did not want to pay the excise tax. (*Id.* at 901-02.) Rubenstein and Shellef had conversations about the excise tax related to the Elf Atochem

---

[3] The factual background sections in this Memorandum and Order summarize the evidence in the light most favorable to the government, as required under Rule 29.

[4] During this time, Shellef had a desk at the office in Rubenstein's Bayonne warehouse and was there a few times a week. (12/22/09 Tr. 904.) Shellef also sometimes directed Rubenstein's employees at the Bayonne warehouse. (12/23/09 Tr. 991.)

material; neither wanted to pay the tax and neither did pay it. (12/23/09 Tr. 992-93.) On multiple occasions, Shelleff and Rubenstein worked together to sell Elf Atochem in the domestic market. (*See generally* 12/23/09 Tr. 939-85; *see also id.* at 990 ("[W]e had a joint venture on the Elf Atochem material. [Shelleff] supervised the process being done, and we went into a joint venture in 1998 on Poly Systems USA.").)

Although the Elf Atochem CFC-113 had never been used, Shelleff instructed Rubenstein to label the material as "reclaimed." (*See, e.g.*, *id.* at Tr. 970, 983.) However, Shelleff described the Elf Atochem material as virgin when attempting to sell it to one domestic customer. (1/7/10 Tr. 1431-32.) Rubenstein also labeled the material as "for export only." Rubenstein testified that he did this "to sort of cover my own butt that the material was going domestically and I didn't feel that the reclamation was tax exempt as I understood reclamation to be, and, therefore, I put for export only, should Elf Atochem ever ask to see whether I exported all the product that I bought from them." (12/23/09 Tr. 938-39; *see also* 1/6/10 Tr. 1338 ("I didn't want to get caught selling domestic Elf Atochem material by the IRS and have to pay excise tax on it.").) When Rubenstein told Shelleff that he was writing "for export only," Shelleff told Rubenstein to "put whatever you want on it." (12/23/09 Tr. 964-65.) Shelleff knew that at least some of the customers to whom he sold the Elf Atochem material were not going to export the product. (*Id.* at 942-43, 958-59, 970-71.)

### b. Allied Signal Material

In 1996, Shelleff purchased about 700,000 pounds of CFC-113 from Allied Signal tax-free for export.[5] (Govt. Ex. 227; 12/16/09 Tr. 206, 212, 224-25, 228, 238-39, 251, 265, 295, 311, 315-16, 329.) Rubenstein invested a small amount of money toward the initial payment by Shelleff to Allied in 1996 (12/23/09 Tr. 1023); however, he was only involved in the shipping and warehousing.[6] At first, Shelleff sold the material for export in keeping with the terms of the contract. However, Shelleff later learned that the government of Israel, his main customer, would no longer purchase CFC-113. (*See, e.g.*, Govt. Ex. 261.) In 1998, Rubenstein and Shelleff discussed the possibility of selling Allied Signal domestically:

> Q. Did you and the defendant ever have a discussion about selling the Allied Signal CFC-113 to customers in the United States?
>
> A. Yes.
>
> Q. Would you please describe that conversation?
>
> A. Well, he wanted to know if he started selling – taking orders, could I at least continue to warehouse the product for him, and process the orders for him. In other words, would I clean the drums, label them, ship them out.

[5] The circumstances of Shelleff's dealings with Allied Signal are discussed in greater detail *infra* in connection with the wire fraud charged in Counts 3-45.

[6] Rubenstein testified that he did not want to get more involved because he did not think worldwide demand for the material was high enough and, although he did not say so to defendant, he feared that the product would end up being sold domestically in evasion of the excise tax. (1/5/10 Tr. 1140.)

(12/23/09 Tr. 1082, 1083.) At some point prior to this conversation, the two had discussed that the Allied contract did not allow domestic sales of the material, and that domestic sales of the material would be subject to the excise tax. (*Id.* at 1083.)

Rubenstein agreed to work with Shellef on the domestic sales of Allied Signal material in about mid-1998 but only "from a warehousing operation, to take it in, clean it up, label it, ship it out. But I didn't want to get involved any further than that as far as – I would not – I was not involved in any profit as far as his domestic sales were concerned." (*Id.* at 1083-84.)[7] In September 1998, Shellef began selling Allied CFC-113 domestically, although he did not tell Allied that he was doing so. (*See* 12/16/09 Tr. 236, 250, 288, 294, 311; 12/21/09 Tr. 636, 702, 705, 709, 711, 713.) Allied, therefore, did not pay excise taxes on the material. (1/11/10 Tr. 1600, 1602.) Rubenstein also never told Allied Signal that it was being sold domestically, although Rubenstein did not know what Shellef told Allied. (12/23/09 Tr. 1170.)

On multiple occasions, Shellef and Rubenstein worked together to sell Allied CFC in the domestic market.[8] (12/23/09 Tr. 1115-27; 1/5/10 Tr. 1144-54.) Shellef used the Bayonne warehouse to store Allied CFC-

113 and Rubenstein helped him with labeling and shipping.[9] (12/23/09 Tr. 1043.) Shellef knew that the excise tax applied to the domestic sales, and never paid the tax.[10] (*Id.* at 1025, 1083; 1/5/10 Tr. 1169-71; 1/11/10 Tr. 1606-15.)

### 2. Legal Standard

Under 18 U.S.C. § 371, it is unlawful "[i]f two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy." The elements of a conspiracy to defraud the government are: "(1) [that defendant] entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *Shellef*, 507 F.3d at 104 (quoting *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996)); *see also United States v. Stewart*, 590 F.3d 93, 109 (2d Cir. 2009). As the Second Circuit has explained,

> it is well established that the term "defraud" as used in section 371 "is interpreted much more broadly than when it is used in the mail and wire fraud statutes," *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988), and that

---

[7] Rubenstein and his warehouse employees got the information for the labels from Shellef. (1/5/10 Tr. 1148.) Shellef instructed Rubenstein to remove the "Allied Signal" name from the CFC containers to be shipped to domestic customers. (12/23/09 Tr. 1095-96.)

[8] Rubenstein did not share in the profits of the domestic sales of Allied Signal. (12/23/09 Tr. 1115-16.)

[9] In 1999, Shellef began using a shipping company called Five Star Consolidated Services. (12/23/09 Tr. 1117.) However, Rubenstein continued to be personally involved in the shipping of the CFC to Five Star's facility. (*Id.* at 1117-25.)

[10] Shellef told Rubenstein that the Allied Signal CFC-113 was virgin material. (12/23/09 Tr. 1024-25.) Defendant's counsel did not dispute at trial that excise taxes applied to these sales; rather, it was argued that defendant believed it was Allied's obligation to pay the tax.

this provision "not only reaches schemes which deprive the government of money or property, but also is designed to protect the integrity of the United States and its agencies. *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987). Thus, this section covers acts that "interfere with or obstruct one of [the United States'] lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest," even if the Government is not "subject to property or pecuniary loss by the fraud." *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S. Ct. 511, 512 68 L. Ed. 968 (1924).

*Ballistrea*, 101 F.3d at 831-32.

"The essence of conspiracy is agreement. In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *Torres*, 604 F.3d at 65 (collecting cases); *see also United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) ("To be guilty of conspiracy, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."). "An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997).

However, "[t]he government's proof of an agreement does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989). "Evidence tending to show knowing participation in the conspiracy is also needed, *i.e.*, facts sufficient to draw a logical and convincing connection between circumstantial evidence of an agreement, and the inference that an agreement was in fact made." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (citations and internal quotation marks omitted). Furthermore, the Second Circuit has noted that "[i]n cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (quotation omitted).

The government must also prove that defendant joined the agreement with the necessary criminal intent. *See United States v. Villegas*, 899 F.2d 1324, 1338 (2d Cir. 1990) ("In order to prove a conspiracy, the government must present 'some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.'" (quoting *United States v. Sanchez Solis*, 882 F.2d 693, 696 (2d Cir. 1989))). "Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." *Torres*, 604 F.3d at 66 (internal quotation and alteration omitted). As the Second Circuit has explained:

"A defendant's knowing and willing participation in a conspiracy may be

inferred from . . . her presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others." It may also be established by "evidence that the defendant participated in conversations directly related to the substance of the conspiracy[,] possessed items important to the conspiracy," or engaged in acts "exhibiting a consciousness of guilt, such as [making] false exculpatory statements."

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (citations omitted).

### 3. Application

Defendant argues that the government failed to prove: (1) the existence of an agreement to obstruct a lawful function of the government and, relatedly, (2) that Shellef had the specific intent to join such a scheme. For the reasons set forth below, the Court rejects both arguments and concludes that, after considering the whole record and viewing the evidence in the light most favorable to the government, there was sufficient evidence to support the jury's verdict of guilty on Count One of the Indictment.

### a. Agreement

Defendant argues that there was insufficient evidence of an agreement with respect to either the Elf Atochem or Allied Signal CFC-113. The Court considers each theory in turn.

### i. Elf Atochem Material

There was sufficient evidence for the jury to rationally conclude that Shellef agreed to obstruct the IRS's collection of excise taxes on the Elf Atochem material. Defendant argues that there was no such agreement, pointing to testimony from Rubenstein that he did not have any specific conversations with Shellef about avoiding paying the excise tax on the Elf Atochem shipments. (*See* Def.'s Br. at 33-34 (citing Tr. 1338).) However, there was considerable circumstantial evidence that Shellef and Rubenstein had a tacit agreement to obstruct the collection of the tax. For instance, Shellef knew that Rubenstein had purchased the material for export and that the excise tax had not been paid. Shellef nevertheless offered to "get rid of" the material domestically. (12/22/09 Tr. 899-900; 12/23/09 Tr. 992-93.) Defendant instructed Rubenstein to put "reclaimed" labels on the material, even though the material had never been used. As discussed above, there was overwhelming evidence that the removal of alcohol from otherwise virgin CFC was not considered "reclamation" so as to render the material tax-exempt.[11] Shellef also knew that Rubenstein was putting false export labels on the material (12/23/09 Tr. 964-65) and told Rubenstein to "put whatever you want on it."[12] Finally,

---

[11] As discussed *infra*, there was more than sufficient evidence from which the jury could have rationally rejected defendant's argument that he had a good faith belief that the material was reclaimed.

[12] Defendant argues that Shellef had no duty to correct Rubenstein's false export labels and that Shellef did not himself include any such labels on the material. However, because the two agreed on the unlawful objective of the scheme, they need not have agreed on all of the details of furthering that scheme, *i.e.*, whether to falsely label material as for export or to falsely label material as reclaimed. *See United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) ("The coconspirators need not have agreed on the details of the conspiracy, so long as they

Rubenstein testified that he: "aided and abetted with reference to CFC-113, storing it, et cetera, and knowing that excise tax was not paid on it." (12/22/09 Tr. 840.)[13] Thus, there was sufficient evidence of a tacit agreement to defraud the government.

Defendant argues that, because Rubenstein had the ultimate tax liability on the Elf Atochem material, Shellef had nothing to gain from obstructing the IRS's collection of excise taxes and, therefore, no reason to enter an agreement to do so.[14] However, on a conspiracy charge, the government is not required to prove that each co-conspirator has a financial interest in the goals of the conspiracy. *See United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003) ("[E]vidence of a financial stake in the venture is not essential to show that the defendant intended to facilitate the unlawful objective of the conspiracy." (quoting *United States v. Isabel*, 945 F.2d 1193, 1203 (1st Cir. 1991))); *United*

*States v. Torres*, 901 F.2d 205, 245 (2d Cir. 1990) (holding that a charge of conspiracy does not require proof that each co-conspirator share a "personal financial interest in the outcome of the conspiracy"); *United States v. Salerno*, 868 F.2d 524, 532 (2d Cir. 1989) ("Even if the evidence is not conclusive that Corallo and Santoro contemplated any direct or immediate remuneration for their help . . . , that does not mean that Corallo and Santoro were not co-conspirators." (collecting cases)).

In short, the Court concludes that there was sufficient evidence for the jury to rationally find that defendant entered an agreement with Rubestein to defraud the government in connection with the sale of Elf Atochem material.

### i. Allied Signal Material

There was also sufficient evidence for the jury to rationally find that Rubenstein and Shellef had a tacit agreement to obstruct the IRS's collection of excise taxes on the Allied Signal material. For instance, both Rubenstein and Shellef knew that Shellef had purchased the material for export under the contract. (12/23/09 Tr. 1083.) They both knew that the excise tax applied on domestic sales and that no such tax had been paid. (*Id.* at 1025, 1083; 1/5/10 Tr. 1169-71; 1/11/10 Tr. 1606-15.) Shellef nevertheless sold the material domestically, and Rubenstein agreed to assist him with the sales.

Defendant argues primarily that Rubenstein had little knowledge of Shellef's dealings with Allied (*see* 1/6/10 Tr. 1215), and, therefore, there could not have been any agreement to defraud the government.[15] The Court rejects

---

agreed on the essential nature of the plan." (quotation omitted)).

[13] Defendant argues that this statement does not technically describe conspiracy liability. Regardless of the words Rubenstein used to describe his activity, the evidence was sufficient for the jury to find the existence of a conspiracy to defraud the government.

[14] To the extent defendant argues that Shellef cannot be guilty of conspiracy as a matter of law because it was Rubenstein who ultimately owed the excise tax on the Elf Atochem material, the Court rejects that argument, as did the Second Circuit on the prior appeal. *See Shellef*, 507 F.3d at 105 ("Just as the [] defendants [in *United States v. Nersesian*, 824 F.2d 1294 (2d Cir. 1987)] could be convicted for misrepresenting the nature of their transactions to a third party who owed an independent duty to the IRS, so can Shellef and Rubenstein.").

[15] Defendant also argues that Rubenstein had no motive to defraud the government with respect to

this argument. As a threshold matter, Shellef is not charged in Count One of the Indictment with conspiring to defraud Allied Signal, but, rather, with conspiring to defraud the government. Therefore, the government was not required to prove on Count One that there was an agreement to deceive Allied Signal.[16] Furthermore, it is well settled that a conspirator need not know all the details of the scheme for there to be an agreement. *See United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) ("The government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent.'" (quoting *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994))); *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989). Defendant focuses specifically on Rubenstein's testimony that he did not know whether Shellef had told Allied Signal that the material was being sold domestically. (*See* 12/23/09 Tr. 1170.) Defendant argues that, because any scheme to defraud the IRS would necessarily depend on

deceiving Allied Signal about the destination of the material, there could be no conspiracy unless there was direct evidence that Rubenstein knew that Shellef was, in fact, deceiving Allied. The Second Circuit rejected a similar argument in *United States v. Sanzo*, 673 F.2d 64 (2d Cir. 1982). The *Sanzo* Court explained:

> Sanzo next argues that there was insufficient evidence to demonstrate a conspiracy of income tax evasion because no direct evidence showed that Trainello knew Sanzo would not report the receipts of the cash or that Sanzo knew Trainello would claim tax deductions. . . . [However,] [t]here was sufficient circumstantial evidence from which the jury could find in this case that Trainello knew that Sanzo was unlikely to report as income large sums of laundered money, and that Sanzo equally knew that Trainello would have to assign on his books some legitimate purpose for the payments . . . .

*Id.* at 69. Similarly, in this case, the jury could rationally find, based on the evidence discussed above, that Rubenstein and Shellef had a tacit understanding that they would sell the material domestically and that Shellef would not tell Allied about the domestic sales.

Defendant also argues that there could be no shared goal of defrauding the IRS because Rubenstein performed only lawful services, *i.e.*, warehousing and shipping, and charged Shellef his normal rate.[17] However, viewing

---

the Allied material because he did not share in the profits from the domestic sales of Allied Signal material. (12/23/09 Tr. 1081-84.) However, as discussed *supra*, the government is not required to prove that each co-conspirator has a financial interest in the goals of the conspiracy.

[16] For this reason, the Court rejects defendant's argument that there could be no conspiracy because Rubenstein testified that he "never had an agreement" to "intentionally act in any way to deceive Allied Signal from collecting taxes on domestic sales of its product." (1/7/10 Tr. 1374.) As discussed above, there was sufficient circumstantial evidence for the jury to conclude that there was a tacit agreement to defraud *the government* with respect to the collection of excise taxes on the Allied Signal material, and a tacit understanding that the material would be sold domestically without telling Allied.

[17] For instance, defendant points out that, unlike with respect to the Elf Atochem material, Rubenstein did not create false "for export only" labels on the shipping documents for Allied material. (*See* Def.'s Br. at 30.)

the evidence in the light most favorable to the government, the jury could rationally conclude that Rubenstein's seemingly legitimate warehousing and shipping services were done in furtherance of the unlawful objective of the scheme. *See United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) ("It is well-settled that a conspirator need not be fully informed about his co-conspirators' specific criminal acts provided that he agreed to participate in the broader criminal conspiracy and the acts evincing participation were not outside of the scope of the illegal agreement. 'A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of the other.'" (quoting *United States v. Salinas*, 522 U.S. 52, 63-64 (1997)); *United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003) ("The mere fact that Panek participated with Henry in the suspicious transactions at issue suggests an agreement."); *United States v. Gaviria*, 805 F.2d 1108, 1116 (2d Cir. 1986) ("'[S]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'" (quoting *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984))); *see also United States v. Martino*, 759 F.2d 998, 1004 (2d Cir. 1985).

In short, the Court concludes that the evidence was sufficient for the jury to rationally find that Shellef and Rubenstein agreed to obstruct the collection of excise taxes on the Allied Signal material.

## 2. Fraudulent Intent

The government also had to prove that Shellef had the specific intent to obstruct the IRS's collection of excise taxes. *See Shellef*, 507 F.3d at 104 ("All that is necessary is that the scheme had the object of making it more difficult for the IRS to carry out its lawful functions and that the scheme depend on 'dishonest or deceitful means.'" (quoting *Ballistrea*, 101 F.3d at 831-32)). As set forth below, there was sufficient circumstantial evidence that defendant had the requisite criminal intent to join the conspiracy to defraud the government charged in Count One.

### a. Elf Atochem

There was sufficient evidence that Shellef acted with specific intent to defraud the government with respect to the Elf Atochem material. Shellef and Rubenstein discussed the fact that no excise tax had been paid on the material and that they did not want to pay the tax. Although the material was purchased tax-free for export, Shellef and Rubenstein worked together to sell it domestically. Shellef also instructed Rubenstein to put "reclaimed" labels on the unused material. Defendant argues that Shellef believed in good faith that his water wash process, which removed alcohol from unused material, rendered the Elf Atochem material "reclaimed," and, therefore, tax-exempt. However, there was sufficient circumstantial evidence for the jury to rationally conclude that Shellef did not, in fact, have a good faith belief that his water wash process rendered the material reclaimed. As discussed above, it was well settled in the industry that unused material was virgin and, thus, not tax-exempt.[18] Furthermore, when

---

[18] Defendant points to some evidence in the record that he argues indicates disagreement about what constituted reclaimed CFC-113. (*See* Def.'s Br. at 35.) However, any such inconsistencies were for the jury to decide and, as discussed above, the

Shellef attempted to sell some of the Elf Atochem material to a domestic company in May 1997, Shellef described the material as virgin.[19] (*See* 1/7/10 Tr. 1431-32; Ex. 13333.) This evidence indicates that Shellef believed that the material, which had never been used, was virgin and, therefore, not reclaimed or recycled. The government also introduced evidence of other similar acts by Shellef,[20] from which the jury could properly infer criminal intent in this case.

Finally, defendant argues that Shellef did not intend to defraud the IRS because he had no motive to do so—Rubenstein was the one who owed the tax. However, the jury could have found specific intent based on the evidence discussed above.

### b. Allied Signal

There was also sufficient evidence that Shellef specifically intended to join the charged conspiracy with respect to the Allied CFC-113. For instance, Shellef and Rubenstein discussed the fact that the Allied Signal contract required Shellef to export the material, that no excise taxes had been paid, and that excise taxes would apply to any domestic sales. Shellef nevertheless sold the material domestically without telling Allied, and, indeed, affirmatively represented to Allied that he would sell it for export. (*See* Govt. Ex. 291.) In 1999, Shellef told Rubenstein that he had never filled out an export registration certificate and that "Allied Signal had screwed up by not asking him." (1/5/10 Tr. 1163.) Shellef told Rubenstein that he thought that Allied Signal "was going to come after him for excise tax." (*Id.* at 1162-63.) Shellef also falsely told his customers on the Allied material that the excise tax had been paid or "taken care of." (12/21/09 Tr. 532-33; 1/7/10 Tr. 1384.) Shellef indicated consciousness of guilt when federal agents searched the Bayonne warehouse on October 2, 2000, stating that the federal agents were not after Rubenstein and that Shellef "thought that they were after stuff that he did." (1/5/10 Tr. 1167.) The government also introduced evidence of other similar acts by Shellef that indicate fraudulent intent in this case.[21] Specifically, Shellef worked with Rubenstein to defraud two other companies, 3M and Raychem, by purchasing products for a lower price under the pretense that he would export the products; Shellef then sold those products to domestic customers while keeping the profits. (*See* 12/23/09 Tr. 1003-20.) The fact that Shellef engaged in such conduct and had such discussions is circumstantial evidence of his intention to obstruct the IRS's collection of the

---

evidence was sufficient for the jury to rationally conclude that Shellef did not himself believe that the material was reclaimed. Defendant also focuses on the fact that there was no evidence that Rubenstein told Shellef about his beliefs regarding reclamation. The Court rejects this argument as well. As discussed above, there was circumstantial evidence that Shellef did not believe the material was actually reclaimed.

[19] The witness, Keith Moore, actually testified that he dealt with "Joe Stein" of Poly Tuff USA. However, Rubenstein testified that "Joe Stein" was an alias used by Shellef's company. (*See* 12/23/09 Tr. 949-50, 1052.)

[20] Specifically, there was evidence that Shellef defrauded the Government of Israel by using aliases and by falsely labeling virgin CFC-113 as reclaimed. (12/23/09 Tr. 949-50, 1046-75; Govt. Exs. 9, 15-A, 16, 18, 20-A, 21, 22, 40, 41, 52, 53.) As discussed *infra*, this evidence was properly admitted under Rules 403 and 404(b) of the Federal Rules of Evidence.

[21] As discussed *infra*, this evidence was properly admitted under Rules 403 and 404(b) of the Federal Rules of Evidence.

tax. *See, e.g.*, *United States v. Gurary*, 860 F.2d 521, 525 (2d Cir. 1988) ("[T]he conversation . . . regarding the tax difficulties . . . indicates defendants were well aware their scheme would prevent or impede the IRS from learning the source of the cash received . . . ."); *see also, e.g.*, *United States v. Meneilly*, 78 F. Supp. 2d 95, 103-04 (E.D.N.Y. 1999) ("[T]he mere fact that there is no direct evidence that [defendant] and one or more of his co-conspirators discussed the effect that their intended conduct would have on the IRS is not fatal to the prosecution's case. The necessary proof of intent may be predicated upon a finding that [defendant] and another conspirator or conspirators had 'at least a tacit or mutual understanding that the IRS would not be informed . . . and the IRS' functions would accordingly be impaired.'" (quoting *United States v. Collins*, 78 F.3d 1021, 1039 (2d Cir. 1996))), *aff'd*, 28 F. App'x 26 (2d Cir. 2001).

Defendant argues that Shellef's conversation about the tax implications of domestic sales of Allied CFC-113 indicates only that Shellef intended to get out of an oppressive contract with Allied and let Allied be stuck with the tax liability.[22] However, based on all of the evidence discussed above, the jury could rationally find that, even if Shellef intended to get out of his contract with Allied, he also had the intention of defrauding the government. *See United States v. Stewart*, 590 F.3d 93, 110 (2d Cir. 2009) ("Stewart insists that she acted with the intent, not to defraud the government, but to 'zealously' represent her client. . . . [E]ven if Stewart acted with an intent to represent her client zealously, a rational jury could nonetheless

have concluded that Stewart simultaneously acted with an intent to defraud the government.").

*** 

In short, the Court concludes, based on a review of the whole record and viewing the evidence in the light most favorable to the government, that there was sufficient evidence for the jury to rationally find that defendant was guilty of conspiring to obstruct the IRS's collection of excise taxes on both the Elf Atochem and Allied Signal CFC-113.[23] Accordingly, defendant's motion for acquittal and/or a new trial with respect to Count One of the Indictment is denied.

B. Count Two:
Filing a False Tax Return

In Count Two of the Indictment, defendant is charged with filing a false tax return in violation of 26 U.S.C. § 7206(1). For the reasons set forth below, the Court concludes that the evidence was sufficient to support the jury's verdict.

1. Factual Background

The 1999 corporate tax return for Poly Systems, Shellef's company, was prepared by Shellef's accountant, Stephen Kashinsky of Stein Kashinsky. Kashinsky did not do an independent audit of Shellef's records and, instead, asked for all of Shellef's records and

_____

[22] The Court notes that there was testimony that Shellef never asked to be let out of the contract. (12/16/09 Tr. 279.)

_____

[23] Because there was sufficient evidence of conspiracy with respect to both the Elf Atochem and Allied Signal material, the Court rejects defendant's argument (*see* Def.'s Br. at 38 n.8) that there is no way of knowing under which theory the jury found defendant guilty of Count One and that a new trial is required under Rule 33.

16

relied only on the information provided to him by Shellef. (1/11/10 Tr. 1708-10.) Shellef did not disclose to Kashinsky the existence of, or provide him with any information regarding, two bank accounts held in the name of Poly Systems: (1) Account Number 149001604 at Commercial Bank of New York[24] (*see* Govt. Ex. 113); and (2) Account Number 5324007151 at North Fork Bank (*see* Govt. Ex. 116). (1/12/10 Tr. 1738-43, 1748-52.) These accounts held a total of $782,781 (*id.* at 1752)—which represented the proceeds from Shellef's domestic sales of Allied Signal CFC-113. (*Id.* at 1738-43, 1748-52.) Indeed, in August 1999, Shellef specifically instructed All Discount Labs, one of his domestic customers, to send payment to the Commercial Bank of New York account. (*See* 1/14/10 Tr. 2057-58.)

After receiving an extension of time (1/12/10 Tr. 1787, 1804), Kashinsky filed the 1999 Poly Systems corporate tax return, which was signed by Shellef on September 14, 2000, and which was received by the IRS on September 18, 2000. (Govt. Ex. 98.) The tax return stated that the total amount of sales for Poly Systems for the year 1999 was $986,224, which was based on the documents provided by Shellef to Kashinsky. (Govt. Ex. 98; 1/11/10 Tr. 1716; 1/12/10 Tr. 1751.) The income figures on the return did not include the $782,781 held in the Commercial Bank and North Fork Bank accounts discussed above because Shellef did not provide any information on those accounts to his accountant. (1/12/10 Tr. 1751-52; *see also* 1/13/10 Tr. 1883.)

Shellef fired Kashinsy in September 2000.

(1/11/10 Tr. 1703.) On October 2, 2000, federal authorities searched Shellef's home in Great Neck, New York and his warehouse office in Bayonne, New Jersey. (1/7/10 Tr. 1497-98.) On October 5, 2000, Shellef met with a new accountant, Michael Maddaloni,[25] and told him that there were Poly Systems sales that were not included on the original return. (1/13/10 Tr. 1878-79.) In November 2000, Shellef filed an amended tax return, which reported gross sales of $1,746,925 (about $800,000 in additional income). (1/13/10 Tr. 1872-73; Govt. Ex. 99.)

## 2. Application

Under 26 U.S.C. § 7206(1),

[a]ny person who . . . [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony . . . .

26 U.S.C. § 7206(1). Thus, the elements the government must prove beyond a reasonable doubt are:

(1) that the defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; (4) that the return contained a written declaration that it was made under the penalty of perjury. A false statement is 'material' when it

---

[24] Shellef had another bank account at the same Commercial Bank of New York about which he did tell Kashinsky. (*See* 1/12/10 Tr. 1738-39.)

[25] Shellef was recommended to Maddaloni by Rubesntein. (*See* 1/13/10 Tr. 1874-75.)

has 'the potential for hindering the IRS's efforts to monitor and verify the tax liability' of the corporation and the taxpayer.

*United States v. Pirro*, 212 F.3d 86, 89 (2d Cir. 2000); *see also United States v. LaSpina*, 299 F.3d 165, 179 (2d Cir. 2002).

Defendant argues that the government failed to prove that Shellef acted willfully and also failed to prove that the tax return was false as to a material matter. For the reasons set forth below, the Court rejects both arguments.

### a. Willfulness

In a prosecution under § 7206(1) "'[w]illfully' means 'an intentional violation of a known legal duty'; gross carelessness or negligence is not sufficient." *United States v. Dyer*, 922 F.2d 105, 108 (2d Cir. 1990) (citations omitted); *see also Cheek v. United States*, 498 U.S. 192, 200 (1991) (defining "wilfulness" as "'a voluntary, intentional violation of a known legal duty'" (quoting *United States v. Bishop*, 412 U.S. 346, 360 (1973))). "The willfulness of one accused of tax crimes may be proved by circumstantial evidence. As a practical matter, such evidence is likely to be the only type to support or rebut a good faith defense other than the word of the defendant himself." *United States v. Schiff*, 801 F.2d 108, 111 (2d Cir. 1986) (citations omitted); *see also United States v. Klausner*, 80 F.3d 55, 63 (2d Cir. 1996) ("Willfulness may be inferred from circumstantial evidence.").

The Court concludes that the evidence was sufficient for the jury to rationally find that defendant acted willfully in filing a false tax return. The evidence showed that Shellef did not report $782,781 in income, which represented the proceeds of his domestic sales of Allied Signal CFC-113. As discussed above, Shellef knew that this material had been purchased tax-free for export, but nevertheless sold the material domestically, did not tell Allied he was doing so, and did not himself pay the excise tax. He did not disclose to his accountant or provide any information regarding the two accounts that held the $782,781 in question. Indeed, Shellef specifically asked one of his customers to place the money from his domestic sales in the Commercial Bank of New York account that he did not tell his accountant about. Thus, there was sufficient circumstantial evidence that defendant's false statement of income in the 1999 tax return was willful. *See United States v. Bok*, 156 F.3d 157, 166 (2d Cir. 1998) ("[Defendant's] failure to file . . . until told to do so by the IRS is indicative of an intent to evade the tax system. This is particularly true in light of [defendant's] legal education, which included coursework in both corporate and personal taxation." (discussing willfulness requirement of 26 U.S.C. § 7206(1)); *see also United States v. Perez*, --- F.3d ---, No. 08-2566, 2010 WL 2652464, at *7 (7th Cir. July 6, 2010) ("[W]illfulness may be inferred from conduct such as . . . concealment of assets or covering up sources of income . . . ." (quotation omitted)); *United States v. Olbres*, 61 F.3d 967, 972 (1st Cir. 1995) ("To make matters worse, the two source materials that most easily could have identified the unreported income—the invoice log and the passbook for the business savings account—were withheld from the defendant's accountant . . . . While the defendants maintained other books and records from which the existence of these funds could perhaps be gleaned . . . , it is readily evident that a jury plausibly could infer from these facts that the defendants clumsily attempted to

conceal income from both their tax preparer and their government.") (finding sufficient circumstantial evidence of willfulness in tax evasion case).

Defendant argues that the fact that he filed an amended tax return to include the previously omitted income is evidence of a lack of willfulness. As this Court instructed the jury (*see* 1/21/10 Tr. 2538), the fact that a defendant files an amended return may indicate a lack of willfulness. *See Dyer*, 922 F.2d at 108. However, although a jury *could have* found that the amended return indicated a lack of willfulness, the mere fact that Shellef filed an amended return does not by itself preclude a finding of willfulness by the jury.[26] *See, e.g.*, *United States v. Tishberg*, 854 F.2d 1070, 1073 (7th Cir. 1988) ("[Defendant's] subsequent conduct may demonstrate a good faith effort to correct his previous mistakes. . . . It does not, however, negate, the import of his previous action."). Shellef did not tell either of his accountants about the two bank accounts or file an amended return until after the government searched his home and the Bayonne warehouse office on October 2, 2000.[27] Thus, the circumstances surrounding the filing of the amended return provided a basis for the jury to rationally find that the amended return did not indicate a lack of willfulness in the filing of the original return.

Defendant also argues that, because the two bank accounts in question were openly held in the name of Poly Systems, Inc. with the correct federal tax identification numbers (1/12/10 Tr. 1799-1801), there was insufficient evidence of willfulness. Specifically, defendant argues that the "open" nature of the accounts reveals a lack of intent to conceal the income and also that his accountant should have found the accounts and reported the income contained therein. In essence, defendant argues that he cannot be guilty of a crime based on the negligence of his accountant.[28] However, given the evidence discussed above that Shellef did not provide information on the two accounts to his accountant, and the two accounts contained the income from the domestic sales of CFC, on which no excise tax had been paid, there was sufficient circumstantial evidence for the jury to conclude that Shellef acted willfully in filing a false tax return.

---

[26] To the extent the government argues that the jury could infer that defendant acted willfully merely *because* he filed the amended tax return, the Court rejects such an argument and, in fact, instructed the jury that no such inference could be drawn. (*See* 1/21/10 Tr. 2538.)

[27] Defendant points out that he actually fired Kashinsky in September 2000 (1/11/10 Tr. 1703; 1/12/10 Tr. 1776), which was before he learned of any investigation. (Def.'s Br. at 42.) However, this is not necessarily indicative of a lack of willfulness. Although Shellef fired Kashinsky in September 2000, he did not speak to his new accountant about the unreported income or file an amended tax return until after he learned of the federal investigation. Thus, the jury could have

concluded that Shellef fired Kashinsky not because of any issue with the unreported income, but perhaps because the accountant was late with filings. (*See* 1/12/10 Tr. 1754 ("A. The only dissatisfaction he expressed to me was the lateness to the due date of getting his tax return, plus our fees. Q. You didn't quarrel about the numbers on the return? A. No."); *see also* Tr. 1804, 1812-13, 1825-26.)

[28] Defendant also points to inconsistencies in Kashinsky's testimony, such as whether Kashinsky knew about a bank account held by Shellef in Switzerland. (*See* Def.'s Br. at 43-45.) However, any inconsistencies in the evidence or questions of witness credibility were for the jury to decide.

## 2. Materiality

Defendant argues that the misstated income resulted in an additional tax liability of only $4,000 (*see* Def.'s Br. at 46) and, therefore, the misstatement in the 1999 corporate tax return was immaterial as a matter of law.[29] The Court rejects this argument for the reasons set forth below.[30]

"In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)); *United States v. Mittelstaedt*, 31 F.3d 1208, 1221 (2d Cir. 1994) (holding that omitting information from tax return was material for purposes of § 7206(1) prosecution because it "'had the potential for hindering the IRS's efforts to monitor and verify [defendant's] tax liability'" (quoting *United States v. Greenberg*, 735 F.2d 29, 32 (2d Cir. 1984))); *accord United States v. Klausner*, 80 F.3d 55, 60 (2d Cir. 1996) ("In order to establish a violation of § 7206(2), the government must prove that a tax return is false as to a material matter. In the present case, the itemized deductions on the income tax returns of [defendant's] clients constituted material matters if they were essential to the accurate computation of the clients' taxes." (collecting cases)).

In this case, the fact that the additional tax liability may have been only $4,000 does not render the misstatement immaterial as a matter of law. *See United States v. Citron*, 783 F.2d 307, 313 (2d Cir. 1986) (rejecting argument that material falsity for purposes of § 7206(1) is that which results in a substantial tax due); *United States v. Greenberg*, 735 F.2d 29, 31-32 (2d Cir. 1984) ("[Defendant's] argument that the misstatements were not material because they resulted in, at most, minimal underpayments of taxes ignores the potential of the misstatements for impeding the IRS's performance of its responsibilities."). The misstatement, which omitted Shellef's income from the domestic sales of CFC, clearly had the potential for impeding the IRS's performance of its responsibilities regarding the collection of excise taxes on CFC-113. Thus, the Court rejects defendant's argument that the misstatement of income was immaterial as a matter of law.

\*\*\*

In short, the Court concludes that the evidence was sufficient for the jury to rationally find defendant guilty of willfully filing a false tax return under Count Two of the Indictment.

### C. Counts 3-45:
### Wire Fraud

Counts 3-45 of the Indictment charge Shellef with wire fraud under 18 U.S.C. § 1343

---

[29] The government argues that the additional tax liability was higher than $4,000. (*See* Govt. Br. at 33.) However, the Court need not address this issue because even assuming *arguendo* that the additional liability was $4,000, the evidence was sufficient for the jury to rationally find that the misstatement was material.

[30] The government correctly points out that the materiality of a false statement in a § 7206(1) prosecution is a question of fact for the jury. *See Neder v. United States*, 527 U.S. 1, 19-20 (1999) ("We thus hold that the District Court's failure to submit the element of materiality to the jury with respect to the tax charges was harmless error."); *see also Washington v. Recuenco*, 548 U.S. 212, 219 (2006).

in connection with his purchase of CFC-113 from Allied Signal.[31]  For the reasons set forth below, after having considered the whole record and viewing the evidence in the light most favorable to the government, the Court concludes that the evidence was sufficient for the jury to rationally find defendant guilty of the wire fraud counts.

### 1. Factual Background

As discussed above, Shellef agreed to purchase approximately 700,000 pounds of CFC-113 from Allied Signal pursuant to a January 1, 1996 Agreement (hereinafter "1996 Agreement").  (Govt. Ex. 227.)  The first paragraph of the contract provided:

> Destination of Material: Buyer hereby represents and warrants that Material to be sold and purchased hereunder shall be for resale to entities within the following countries only (the "Territory"): Israel, Saudi Arabia, Syria, Egypt and Jordan.

(Govt. Ex. 227, ¶ 1.)  The agreement also provided:

> Any tax or other governmental charge upon the inventory, sale and/or shipment of the Material including any federal excise tax imposed on the sale of the Material . . . which is not anticipated by Seller at the time of contract execution but hereafter becomes effective for or during the period hereof, shall be added to the price herein provided, and shall be invoiced to Buyer. . . .  Seller agrees to pay any such tax or other governmental charge to the appropriate federal, state or municipal authority . . . .  Buyer agrees to indemnify and hold Seller harmless from any liability for additional taxes, interest or penalties assessed by any federal, state or municipal authority and based upon a determination that the tax or governmental charge should have been paid by Seller prior to the time described above, but after execution of this Contract.

(Govt. Ex. 227, ¶ 11.C.)  In other words, if excise taxes became due on the material, Allied was entitled to collect the amount of the tax from Shellef.  (*See* 12/16/09 Tr. 211-12.)

In about 1996-97, Shellef became aware that he could no longer export CFC-113 to Israel and stopped doing so.  (*See* 12/23/09 Tr. 1081; Govt. Ex. 261.)  Beginning in 1997, Shellef stopped ordering the Allied material as required.  (*See* Def.'s Br. at 23.)  After some negotiations between the parties, the contract was amended in December 1997 (Govt. Ex. 252) and again in January 1998 (Govt. Ex. 272).  Both of those amended contracts left unchanged the requirement that Shellef export the material to the specifically defined territory.  However, in September 1998, Shellef began selling the Allied material domestically.  (*See, e.g.*, Govt. Exs. 443, 444, 449.)

On September 11, 1998, Shellef attended a meeting with Allied Signal representatives.  Defendant introduced into evidence at trial a tape recording of that meeting.  (*See* Def.'s Ex. RR.)  At the meeting, Shellef stated: "I told you about the guy in Israel that he's expecting to – to work on – on – on ah, being able to bring this material in, certain quantity for

---

[31] Both defendant and the government treat Counts 3-45 collectively in their arguments regarding the sufficiency of the evidence on the wire fraud convictions.

[1999]. . . . I hope[] that it will happen." (Tr. of Def.'s Ex. RR, Def.'s Opening Br. Appendix, Ex. W, at 3.) At some point after the September 11, 1998 meeting, Shellef spoke on the telephone with Allied's attorney, Anne Madden. Madden testified that "the main gist of the call . . . was that there may be an opportunity to sell to a party in Israel who's interested in the material." (12/22/09 Tr. 712-13.) During September and October 1998, Shellef and Allied continued to negotiate terms such as purchase price; but there were no discussions about domestic sales of the material. (*See* 12/16/09 Tr. 282-94.)

The parties agreed to a final amendment in November 1998. (Govt. Ex. 291; 12/16/09 Tr. 291-94.) The November 1998 agreement provided that "AlliedSignal will grant Poly Systems the exclusive right to sell the material into the Territory, as defined in the Agreement . . . ." (Govt. Ex. 291.) The original agreement was incorporated by reference. (Govt. Ex. 291 ("The other terms and conditions of the Agreement, except to the extent they are inconsistent with the above provisions, shall continue in full force and effect.").) Thus, the requirement that Shellef sell the material in the designated territory remained unchanged. (*See* 12/16/09 Tr. 293-94; 12/22/09 Tr. 711-12.) Shellef initialed various changes to the agreement and signed the agreement on November 30, 1998. (Govt. Ex. 291; 12/16/09 Tr. 291-93.) Allied did not charge any excise taxes to Shellef pursuant to the contract amendments. (12/16/09 Tr. 295.) However, as discussed above, Shellef had already begun selling Allied CFC-113 domestically and continued to do so after the November 1998 agreement. (*See* 12/23/09 Tr. 1115-27; 1/5/10 Tr. 1144-54; Govt. Exs. 443, 444, 449.)

### 2. Legal Standard

As the Second Circuit explained: "The 'essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme.'" *Shellef*, 507 F.3d at 107 (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)). With respect to the first element, the government must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted). With respect to the element of fraudulent intent or scienter, "the proof must demonstrate that the defendant had a 'conscious, knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim.'" *United States v. Gaudagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *United States v. Leonard*, 61 F.3d 1181, 1187 (5th Cir. 1995)). Thus, "'[m]isrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution.'" *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)). "'Instead, the deceit must be coupled with a contemplated harm to the victim.'" *Id.*

### 3. Application

Defendant argues that the evidence was insufficient to support a conviction on the wire fraud counts because: (1) Allied Signal did not have a valid property interest in the amount of unpaid excise taxes; (2) Shellef made no affirmative misrepresentations to Allied; and (3) Shellef did not act with fraudulent intent. For the reasons set forth below, the Court

rejects defendant's arguments and concludes that the evidence was sufficient to support the jury's verdict.

### a. Property Interest

The Indictment alleges that Shellef engaged in a scheme to defraud Allied Signal of its right to collect the amount of unpaid excise taxes on CFC-113. Under the original 1996 agreement, and subsequent amendments to the contract, Allied was entitled to collect from Shellef the amount of any excise taxes on CFC-113 that were not anticipated at the time of the contract. (Govt. Ex. 227, ¶ 11.C.) Because Shellef sold the material domestically, an excise tax on the material became due, making Allied Signal, as the manufacturer, liable for the taxes and entitled to collect the amount from Shellef under the contract.[32] (*See* 12/16/09 Tr. 211-12; *see also* 1/11/10 Tr. 1579-80.)

Defendant argues that, despite the language of the contract, the applicable excise tax regulations do not give rise to any tax liability by Allied Signal and, therefore, Shellef could not have defrauded Allied of any property. Defendant points to 26 C.F.R. § 52.4682-5(e), which provides:

> The purchaser of ODCs [ozone depleting chemicals] in a qualifying sale for export is treated as the manufacturer of the ODC and is liable for any tax imposed under section 4681

. . . when it sells or uses the ODCs if that purchaser does not – (i) [e]xport the ODCs and document the exportation of the ODCs in accordance with paragraph (d)(4) of this section; or (ii) [s]ell the ODCs in a qualifying resale for export.

26 C.F.R. § 52.4682-5(e)(1); *see also id.* § 52.4682-5(e)(2) (discussing resales for export). A sale is "qualifying" if:

> (A) The Seller is the manufacturer or importer of the ODCs and the purchaser is a purchaser for export or for resale to a second purchaser for export;
>
> (B) At the time of the sale, the seller and the purchaser are registered with the Internal Revenue Service; and
>
> (C) At the time of the sale, the seller –
>
> > (1) Has an unexpired certificate in substantially the form set forth in paragraph (d)(3)(ii) of this section from the purchaser; and
> >
> > (2) Relies on the certificate in good faith.

26 C.F.R. § 52.4681-5(d)(1)(i); *see also id.* § 52.4682-5(d)(1)(ii) (discussing resales for export). Shellef argues that, based on these regulations, because he misrepresented the destination of the Allied CFC-113 (viewing the evidence in the light most favorable to the government), the tax liability on the domestic sales passed from Allied to Shellef. Under this theory, because Shellef himself had the ultimate tax liability, Allied had no property right to collect the amount of the taxes from Shellef. The Court rejects this argument for the reasons set forth below.

---

[32] The fact that the IRS ultimately did not attempt to collect the excise taxes from Allied Signal (*see* 1/14/10 Tr. 2106-07) is irrelevant. *See United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) ("[T]he government need not prove that the scheme successfully defrauded the intended victim.")

As a threshold matter, defendant did not raise this argument or refer to this regulation before or during trial and certainly did not argue to the jury that Shellef owed the tax himself.[33] In fact, defendant argued the opposite, *i.e.*, that Allied, as the manufacturer, ultimately owed the excise taxes. (*See* Def.'s Reply Br. at 10 ("No doubt that Shellef's counsel spent considerable time with Allied's witnesses during cross-examination seeking to get them to concede that Allied incurred a tax liability for failing to 'qualify' its export sales to Poly Systems.").)

To the extent defendant argues that the Court should have instructed the jury on this specific tax regulation as it related to Allied's property interest, such argument has been waived. The Court properly instructed the jury on the elements of wire fraud, including the requirement that the government prove that "the alleged scheme contemplated depriving another of money or property." (1/21/10 Tr. 2544.) Defendant did not object to this instruction (*see* 1/19/10 Tr. 2176-78), nor did defendant propose an alternative instruction on this issue. (*See* Def.'s Proposed Jury Instructions, Jan. 14, 2010, Dkt. 399, at 62-71.) Accordingly, the Court rejects any argument that the jury should have been instructed on this regulation as relevant to the wire fraud counts. *See United States v. Javino*, 960 F.2d 1137, 1144 (2d Cir. 1992) ("Count 3 charged [defendant] with receipt and possession of a destructive device not identified by serial number . . . . [T]he failure to mention that identification other than by a serial number could have been authorized under [the regulation] was an omission as to potentially applicable law, not an omission as to the element of the offense. Since [defendant] did not request that the court instruct the jury with respect to this regulation, his present challenge is waived."); *see also United States v. Plitman*, 194 F.3d 59, 66 (2d Cir. 1999) ("The instruction [defendant] seeks with respect to the earned income exclusion . . . is not a definition of income but a taxpayer election that takes funds out of the scope of income upon proof of certain facts. Thus, the exclusion is not a part of the elements of the tax evasion crime but instead is a theory or set of facts that defendant may attempt to prove in order to exclude funds from the ambit of unreported taxable income." (citations omitted)); *United States v. Stratton*, 779 F.2d 820, 826 (2d Cir. 1985) ("[Defendant] argues that the trial court improperly failed to instruct the jury on the elements of a section 841 violation. . . . If [defendant] wished to raise a technical legal issue (*e.g.*, whether particular acts are sufficient to constitute constructive possession), he was required to alert the trial judge to his concern.").

[33] The only time this regulation was referenced at trial was by the government in connection with the jury instructions on the conspiracy charged in Count One. (*See* Govt.'s Objections to Def.'s Prop. Jury Instructions, Jan. 16, 2010, Dkt. 402.) Defendant argued that the Court should instruct the jury that a manufacturer had to comply with certain procedural requirements in order for the material to qualify for the export exemption. (*See* 1/19/10 Tr. at 2163-64, 2168-69.) The government responded that if the Court were to instruct the jury on certain procedural requirements, it should also instruct the jury on the instant regulation, *i.e.*, that the ultimate tax liability could, in some circumstances, pass to the purchaser of the material. (1/19/10 Tr. at 2170.) The Court ruled that the procedural requirements at issue were irrelevant on the conspiracy count, except insofar as they related to defendant's specific intent or the credibility of Allied Signal witnesses. (1/19/10 Tr. at 2171;1/21/10 Tr. 2504-05.) In any event, defendant did not raise the regulation at all in connection with Allied's property interest on the wire fraud counts.

To the extent defendant argues that, because of the regulation, it was impossible for Allied to have a property interest in the excise taxes in this case, the Court disagrees. First, the Second Circuit has already held that Allied had a valid property right, under the contract, to collect from Shellef the amount of the excise tax on domestic sales of CFC-113:

> Allied . . . did not receive the money due it under the agreement, property that was owed to it. To be sure, that money was destined to be passed on to the government. But that is not relevant to our inquiry. Allied had a right to the property and Shellef's scheme was intended to deprive Allied of it. It was therefore a scheme to deprive within the meaning of the wire fraud statute.

*Shellef*, 507 F.3d at 109-110 (citing *United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006)).[34] Furthermore, assuming *arguendo* that defendant had properly raised this argument at trial, a jury could have rationally found, based on the evidence, that Allied retained the excise tax liability despite the regulation in question. Contrary to the gist of defendant's argument, 26 C.F.R. § 52.4682-5(e) does not afford absolute immunity from tax liability to a manufacturer when the purchaser sells the material domestically unbeknownst to the manufacturer. Instead, the regulation applies only to "qualifying" sales. As defendant repeatedly argued at trial, there was considerable evidence that Allied failed to properly qualify the sales for export by, for instance, not obtaining the necessary

export certificates from Shellef. (*See* 12/17/09 Tr. 363-69; 12/22/09 Tr. 833; 1/5/10 Tr. 1162-63; 1/11/10 Tr. 1634.) Because the sales to Shellef were not qualifying, Allied would have retained the tax liability.[35] Thus, the alleged scheme to defraud Allied of its right to collect unanticipated taxes from Shellef deprived Allied of a property interest.

Defendant cites testimony from several Allied witnesses that they believed Allied had no tax liability, as well as testimony from an IRS agent who stated that she did not know whether Allied would have any tax liability in the circumstances of this case. (Def.'s Reply Br. at 5-6.) However, whether the tax regulations applied to a given set of facts is a question of law, and these witnesses' beliefs about Allied's liability are, therefore, irrelevant on this point.[36]

---

[34] Defendant argues that this issue was not raised to the Second Circuit and that "the Second Circuit was acting upon an incorrect understanding of the applicable federal excise tax law." (Def.'s Br. at 6.)

---

[35] Defendant also argues that (viewing the evidence in the light most favorable to the government), Allied acted in good faith in selling the material to Shellef tax-free for export, and, therefore, the tax liability passed to Shellef. However, in order for a sale to be qualifying, the seller must comply with the procedural requirements in addition to acting in good faith. *See* 26 C.F.R. § 52.4682-5(d)(i)(C).

[36] The Court rejects defendant's argument that Allied substantially complied with the registration requirements. To be qualifying, the sale must have been accompanied by IRS registration and export certificates, nether of which was accomplished here. Defendant also argues that, if Allied failed to comply with the procedural requirements, then Allied would have no contractual right to the amount of the excise taxes because Allied could not claim that the taxes were "not anticipated," given Allied's own failure to qualify the sales. (*See* Def.'s Reply Br. at 8 n.2.) The Court rejects this argument. Even if Allied could anticipate its own procedural failures, the procedural failures would not have resulted in a tax liability if Shellef had complied with the terms of the contract and sold for

Thus, the Court rejects defendant's argument that Allied had no property interest in the amount of unpaid excise taxes as a matter of law.

### 3. Affirmative Misrepresentations

Defendant also argues that the government failed to prove that Shellef engaged in a scheme to defraud because Shellef made no affirmative misrepresentations in connection with Allied material. However, as set forth below, the Court concludes that there was sufficient evidence of affirmative misrepresentations by Shellef for the jury to rationally find that Shellef engaged in a scheme to defraud.[37]

_____

export only. Given Shellef's misrepresentations, Allied could not have anticipated such a tax liability.

[37] As this Court instructed the jury (*see* 1/21/10 Tr. 2542-44), the government had to prove that Shellef engaged in a scheme to defraud with affirmative misrepresentations. In other words, the jury could not convict based solely on omissions by Shellef. Defendant argues that the government improperly relied on a theory of omissions in its argument to the jury. However, the government did argue that Shellef made false statements in connection with his wire fraud scheme, including that he lied in the November 1998 agreement (1/20/10 Tr. 2282-83) and lied to Anne Madden on the telephone about his having an opportunity to sell in Israel (1/21/10 Tr. 2465-66). Furthermore, assuming *arguendo* that some of the government's arguments suggested that Shellef could be convicted on the basis of omissions, the Court concludes that, given the instructions to the jury (*see, e.g.*, 1/21/10 Tr. 2542-44; *see also* 1/20/10 Tr. 2264), and the evidence discussed *infra*, there was sufficient evidence for the jury to rationally find that Shellef made affirmative misrepresentations as part of the scheme to defraud Allied. *See, e.g.*, *United States v. Evergreen Int'l*, 206 F. App'x 71, 75 (2d Cir.

By agreeing to the November 1998 amendment to the Allied contract, Shellef affirmatively represented that he would sell CFC-113 in the designated territory. The territory is specifically mentioned in the November 1998 agreement: "AlliedSignal will grant Poly Systems the exclusive right to sell the material into the Territory, as defined in the Agreement." (Govt. Ex. 291.) Furthermore, the November 1998 agreement states that all previous terms of the contract were incorporated by reference. Shellef signed the November 1998 agreement, thus representing that he would sell the material for export. The government presented overwhelming evidence that Shellef's affirmative representation in the November 1998 agreement was false. Shellef had already stopped exporting the material in 1996 or 1997 (12/23/09 Tr. 1081), and had begun selling it domestically in or about September 1998 (*See, e.g.*, Def.'s Br. at 11.) Because Shellef was already selling the material domestically at the time of the November 1998 agreement, and continued to do so thereafter, the jury could rationally conclude that Shellef's affirmative representation in the November 1998 amendment was false.

The Court rejects defendant's argument that Shellef never "explicitly" stated in the November 1998 agreement that he would

_____

2006) ("Defendants challenge the government's reliance on evidence that they knew about misrepresentations . . . and failed to take affirmative steps to end them. Whether or not the government was entitled to rely on such evidence, the district court precluded the jury from convicting on [the mail fraud count] using anything other than a 'particular pretense, misrepresentation or promise made about a material fact [] made or caused to be made by the defendant.' To this end, there was sufficient evidence of defendants' affirmative acts in support of the mail fraud.").

export the CFC-113. By signing the agreement, which called for Shellef to sell material in the defined territory and which incorporated all previous terms, Shellef was representing that he would sell the material for export in a certain area. The Court also rejects defendant's argument that the November 1998 contract was too ambiguous for the jury to find that Shellef made an affirmative misrepresentation.[38] Any ambiguities or inconsistencies in the contract, or in the parties dealings, go to the weight of the evidence and were questions for the jury to resolve. Viewing the evidence in the light most favorable to the government, the evidence was sufficient for the jury to rationally find that Shellef made an affirmative misrepresentation in the November 1998 agreement.

The government points to evidence of additional affirmative misrepresentations. For instance, Shellef stated at the September 11, 1998 meeting that a "guy in Israel" was working on being able to take the Allied CFC-113 and Shellef "hope[d]" that this would happen.[39] (*See* Transcript of Def.'s Ex. RR,

Def.'s Opening Br. Appendix, Ex. W, at 3.) Shellef argues that there was no evidence that he did not, in fact, entertain this hope. However, given the above discussed evidence—namely, that Shellef was aware that Israel would not take the material, and Shellef had stopped exporting to Israel and was already selling the material domestically—the jury could find that this statement of hope was an affirmative misrepresentation.[40] *See United States v. Autori*, 212 F.3d 105, 118-19 (2d Cir. 2000) ("[T]he jury could infer that [defendant's] statements [that the investment forecasts were "good" and "credible" and that the investment was "safe"] were representations that contradicted his honest view." (citations omitted)).

Thus, the evidence was sufficient for the jury to rationally find that Shellef engaged in a scheme to defraud with affirmative misrepresentations.

### 4. Fraudulent Intent

Defendant argues that the evidence was

---

[38] Defendant cites several alleged inconsistencies in the contract. For instance, defendant argues that: it was unclear whether the original 1996 Agreement survived after June 1998, and whether the November 1998 agreement truly revived the original contract; there is a typo in the November 1998 agreement regarding the date of the agreement being incorporated by reference (*see* Govt. Ex. 291; 12/22/09 Tr. 712); the November 1998 agreement talks about a "right" to sell in the territory as opposed to an "obligation" to do so (Govt. Ex. 291); and the parties had breached the contract on other occasions. (*See* Def.'s Br. at 14-16, 25.)

[39] Shellef made a similar representation in a subsequent telephone call with Anne Madden. (*See* 12/22/09 Tr. 712-13.)

[40] The government also argues that Shellef made an affirmative misrepresentation when he told Allied representatives at the September 11, 1998 meeting that he had let them know about his inability to sell to Israel as soon as he learned about it. Defendant argues that this statement was true and, even if it was false, it was not materially so. A statement is material if it would naturally lead a reasonable person to change his conduct. *See United States v. Rybicki*, 354 F.3d 124, 145-46 (2d Cir. 2003). The Court concludes that the jury could rationally find that Shellef's statement was false in that Shellef had already known about the Israeli ban on CFC-113. (*See* Govt. Ex. 261.) The jury also could rationally find that the statement, given the context of the negotiations, and viewing the evidence in the light most favorable to the government, was material.

insufficient to show that Shellef acted with the intention of defrauding Allied of any property. The Court disagrees for the reasons set forth below.

The evidence was sufficient to show that Shellef acted with fraudulent intent when he affirmatively represented that he would sell the CFC-113 in keeping with the terms of the Allied contract.[41] Defendant correctly states that he cannot be guilty of wire fraud merely for breaching a contract. (Def.'s Reply Br. at 23 (citing *D'Amato*, 39 F.3d at 1261 n.8 ("To infer fraudulent intent from mere nonperformance [] would eviscerate the distinction between a breach of contract and fraud.")).) However, a defendant can be guilty of fraud when he agrees to a contract with the present intention of not honoring the contract. *See D'Amato*, 39 F.3d 1261 n.8 ("A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract" (citations omitted)); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175-76 (2d Cir. 1993) ("The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform.").

In this case, there was sufficient evidence showing that Shellef had no intention of honoring the November 1998 agreement. Shellef already knew that Israel would not

take the CFC-113 (*see* Govt. Ex. 261), and indeed, Shellef had stopped selling to the government of Israel in 1996-97. (12/23/09 Tr. 1081.) At some point in 1998, Shellef discussed with Rubenstein the possibility of selling the Allied Signal material domestically, although Shellef had already admitted to Rubenstein that the contract did not allow domestic sales. (12/23/09 Tr. 1082-83.) In September 1998, Shellef began selling domestically and continued to do so after the November 1998 agreement. Thus, there was sufficient circumstantial evidence for the jury to conclude that Shellef never intended to honor his affirmative promise in the November 1998 agreement. *See Autori*, 212 F.3d at 116 ("[Defendant] assured investors that the PPM numbers were reliable despite his knowledge that the actual numbers were substantially below expectations. A rational juror, after considering [defendant's] knowledge of the Partnership's problems and [defendant's] conduct in the sales meetings, could infer that he willfully participated in a scheme to defraud."); *United States v. Kinney*, 211 F.3d 13, 17-18 (2d Cir. 2000) (holding that there was sufficient evidence of mail fraud based on evidence that defendant never intended to perform the service called for in the contract) (distinguishing *D'Amato*, 39 F.3d at 1261 n.8); *United States v. Schwartz*, 924 F.2d 410, 420-21 (2d Cir. 1991) (holding that there was sufficient evidence of wire fraud where defendant purchaser misrepresented to manufacturer the intended destination of his re-sales of night vision goggles).[42]

---

[41] For substantially the same reasons, the Court concludes that there was also sufficient evidence for the jury to rationally find that Shellef made the other false statements discussed above with the requisite fraudulent intent.

---

[42] Defendant attempts to distinguish *Schwartz* on the grounds that, in that case, the manufacturer specifically asked the defendant where he intended to sell the night vision goggles and required defendant to produce documentation to that effect. (*See* Def.'s Br. at 16-18.) However, the contract between Shellef and Allied specifically required

There was also sufficient evidence for the jury to rationally conclude that Shellef made the false statements to Allied Signal with the specific intent of defrauding Allied of its contractual right to collect the unpaid excise tax on domestic sales of the material.[43]

Shellef knew that the excise tax applied to domestic sales. He also believed that Allied had "screwed up" by not getting the proper export documents from Shellef; he expected Allied to "come after" him for the unpaid excise taxes. (12/23/09 Tr. 1082-83; 1/5/10 Tr. 1162-65.) Thus, there was circumstantial evidence of Shellef's intent to defraud Allied of its right to collect the amount of unpaid excise taxes. *See D'Amato*, 39 F.3d at 1257 ("When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." (citing *United States v. Regent Office Supply Co.*, 412 F.2d 1174, 1181 (2d Cir. 1970))).

Defendant argues that he never created false export documentation in connection with the Allied Signal material, indicating a lack of fraudulent intent. However, there was evidence that defendant did falsely tell his domestic customers that the tax on the Allied material had been paid. (*See, e.g.*, 12/21/09 Tr. 532-33; 1/7/10 Tr. 1384.) Defendant further argues that his contract with Allied was oppressive and that he wanted to get out of the contract. Defendant also argues that he did not intend to defraud Allied of a property interest in collecting excise taxes because he believed that Allied owed the taxes due to its own procedural failures. However, viewing the evidence discussed above in the light most favorable to the government, the jury could rationally find that, even if Shellef intended to get out of his contract, he nevertheless also had the intent to defraud Allied of its right under the contract. *See Autori*, 212 F.3d at 116-18, 118 ("It is not for the court on a Rule 29 motion to make credibility determinations. . . . Upon our review of the evidence, we conclude that a rational juror could infer beyond a reasonable doubt that [defendant] had the requisite scienter to support his conviction of wire and mail fraud.") (reversing grant of Rule

---

sales in a designated territory for export, and Allied attempted to get export documentation from Shellef. *(See* 1/5/10 Tr. 1163-64.) In any event, even if the defendant in *Schwartz* was more detailed in his misrepresentations than was Shellef, and even if the manufacturer in *Schwartz* required more documentation than did Allied Signal, that does not change the fact that Shellef affirmatively represented to Allied that he would sell the CFC-113 for export in a specific area, when, in fact, he had no intention of doing so.

[43] To the extent the government argues that Shellef made the misrepresentations with the intention of obtaining a better purchase price from Allied on the remaining material under the contract, the Court rejects that argument. As the Second Circuit explained, the only viable wire fraud theory in the Indictment is that Shellef's misrepresentation "induced Allied Signal to continue to sell the product to Poly Systems without paying the excise tax to the Internal Revenue Service, or including the tax in the price it charged Poly Systems." *Shellef*, 507 F.3d at 109 (quotation omitted). The Second Circuit rejected the "no-sale" theory in the Indictment, *i.e.*, that Shellef's misrepresentations caused Allied to sell the material when it would otherwise not have done so. *Id.* at 107-09. There was no theory in the Indictment that Shellef's misrepresentations caused Allied to lower its price (except as it related to the non-inclusion of the excise tax), and the government made no such argument to the jury. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1220 (2d Cir. 1994). In any event, the evidence was sufficient to support the conviction on the tax liability theory discussed above, *i.e.*, that Shellef acted with the specific intent of defrauding Allied of its right to collect the amount of excise taxes on the domestic sales of the material.

29 motion where there was some conflicting evidence as to intent); *accord Stewart*, 590 F.3d at 110; *Shellef*, 507 F.3d at 103.

### D. Counts 46-86:
### Money Laundering

Counts 46-86 charge the defendant with money laundering involving the proceeds of the wire fraud scheme discussed above. Specifically, in Counts 46-50, defendant is charged with "promotion" money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). In Counts 51-86, defendant is charged with "tax fraud" or "concealment" money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(ii) or 18 U.S.C. § 1956(a)(1)(B)(i). For the reasons set forth below, the Court grants defendant's motion for acquittal on Counts 46-50, 52-63, 65-68, 70-75, and 77-82. Defendant's motion is denied with respect to the remaining money laundering counts.

### 1. Legal Framework

In Counts 46-50, defendant is charged with promotion money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). A person is guilty of promotion money laundering if,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [he] conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . .

18 U.S.C. § 1956(a)(1)(A)(i).

In Counts 51-86, defendant is charged

with tax fraud or concealment money laundering. A person is guilty of "tax fraud" money laundering if,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [he] conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986 . . . .

18 U.S.C. § 1956(a)(1)(A)(ii). A person is guilty of "concealment" money laundering if,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [he] conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .

18 U.S.C. § 1956(a)(1)(B)(i).

In short, the government was required to prove on the money laundering counts that Shellef engaged in the relevant financial transactions with the requisite purpose. As the Second Circuit has explained:

> To sustain the substantive money laundering charges, the government must establish that [defendant] (1) knowing that the property involved in a financial transaction represented the proceeds of

some form of unlawful activity, (2) conducted or attempted to conduct a financial transaction, (3) which in fact involved the proceeds of specified unlawful activity, (4) either with (a) the intent to promote the carrying on of specified unlawful activity or (b) the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

*United States v. Hassan*, 578 F.3d 108, 127 (2d Cir. 2008) (citations omitted).

With respect to the "proceeds" requirement, the government must prove that the transactions involved the *profits* of unlawful activity, not merely the gross receipts of such activity. *See generally United States v. Santos*, 553 U.S. 507, 128 S. Ct. 2020, 2022-31 (2008) (plurality opinion).[44]

---

[44] There was no majority opinion in *Santos*, and the Second Circuit has not determined the applicability of *Santos* to contexts outside of the particular situation presented in that case. *See United States v. Drayer*, 364 F. App'x 716, 718-19 (2d Cir. 2010) ("Our Court has not yet had an opportunity to determine the 'narrowest grounds' constituting the holding of *Santos*, but we need not do so now . . . ."). This Court need not decide the outer bounds of the applicability of *Santos* because, in this case, the government concedes that it was required to prove that the charged money laundering involved the profits of unlawful activity. (*See, e.g.*, Govt. Br. at 39 ("[T]he government's position here is fully consistent with *United States v. Santos* . . . .").) Although not relevant to the disposition of this case, the Court notes that, subsequent to the *Santos* decision, Congress has amended the statute to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the

## 2. Application

### a. Duplicative Counts

The money laundering charges in Counts 46-50, 52-63, 65-68, 70-75, and 77-82 are based on isolated wire fraud transactions that were the subject of different counts in the Indictment.[45] Because, by definition, money laundering involves the proceeds of unlawful activity, it is well settled that the transaction charged as money laundering cannot be the same transaction through which the funds became tainted by crime. *See United States v. Napoli*, 54 F.3d 63, 68 (2d Cir. 1995), *abrogated on other grounds by U.S. Sentencing Guidelines as stated in United States v. Genao*, 343 F.3d 578, 584 (2d Cir. 2003); *see also United States v. Hall*, --- F.3d ---, No. 07-3036, 2010 WL 2794306, at *3 (D.C. Cir. July 16, 2010) ("The offense of money laundering must be separate and distinct from the underlying offense that generated the money to be laundered." (collecting cases)); *United States v. Trejo*, --- F.3d ---, No. 07-40216, 2010 WL 2560430, at *7 (5th Cir. June 28, 2010) (rejecting argument on money laundering count that would "run afoul of Congressional intent to create an offense distinct from the underlying crime that generated the dirty money in the first place" (citing *United States v. Heaps*, 39 F.3d 479, 486 (4th Cir. 1994))); *accord United States v. Zvi*, 168 F.3d 49, 57 (2d Cir. 1999) ("In the context of this case, the

---

gross receipts of such activity." *See* 18 U.S.C. § 1956(c)(9).

[45] Specifically, the same transactions charged as money laundering in Counts 46-50 were also charged as wire fraud in Counts 3, 5, 7, 9, and 10, respectively. The transactions charged as money laundering in Counts 52-63, 65-68, 70-75, and 77-82 were also charged as wire fraud in Counts 11-24, 25-28, 29-34, and 35-40, respectively.

'financial transactions' that the government had to establish in order to prove domestic laundering were the very same international 'transmittals' of funds that were necessary elements of the international laundering counts.") (reversing district court and dismissing money laundering charges as multiplicitous where defendant was charged with two counts of money laundering for one transaction).

The government does not dispute that the transactions that underlie Counts 46-50, 52-63, 65-68, 70-75, and 77-82 are exactly the same transactions that underlie various wire fraud counts.[46]  The government now argues that it can overcome this legal problem because the transactions charged as money laundering actually involved the proceeds from earlier uncharged wire fraud offenses. *See, e.g.*, *United States v. Sabbeth*, 262 F.3d 207, 216 n.9 (2d Cir. 2001) ("There was nothing to prevent the jury from concluding that one of the subsequent transfers was bankruptcy fraud and that a *later* subsequent transfer was money laundering." (distinguishing *Napoli*, 54 F.3d at 67)).  With respect to the promotion money laundering charges in Counts 46-50, in which Shellef purchased CFC-113 from Allied Signal, the government argues that the money used to purchase the material came from earlier uncharged transactions in which Shellef sold Allied material domestically, and that each of the subsequent promotion money laundering transactions used the proceeds from the preceding transactions. (*See* Govt. Br. at 36-37.)  With respect to Counts 51-86, the government argues that the money laundering charged in Count 51, *i.e.*, the March 16, 1999 deposit of a cashier's check from one of Shellef's domestic customers, involved the proceeds of an earlier wire fraud offense and that all subsequent counts involve those same proceeds. (*See* Govt. Br. at 37.)

The Court rejects the government's argument.  As a threshold matter, this argument was never made to the jury at any point during the trial.  In fact, in its rebuttal summation, the government did not respond to defendant's argument on this very point.  To the extent the government argues that the jury somehow independently reached the conclusion now offered by the government, the Court finds that any such conclusion would be too speculative in light of the evidentiary gaps that existed in the trial record on this issue.  Although there were earlier uncharged transactions involving the domestic sales of CFC-113 that are reflected in the mass of documents admitted during the trial (*see, e.g.*, Govt. Exs. 443-452), there were no records of any kind that demonstrated where the proceeds of those transactions went, and certainly no evidence that the proceeds were used in the later transactions charged as both wire fraud and money laundering.[47]  When the Court asked the government to clarify its position on this issue at oral argument, the government simply rested

---

[46] For instance, IRS Agent Truesdell testified that the transactions in Counts 46-50 were the same as the transactions charged as wire fraud in Counts Count 3, 5, 7, 9, and 10.  (*See* 1/14/10 Tr. 2072-75.)

[47] For this reason, the government's theory also fails to explain how the transactions in Counts 46-50, which were payments *to* Allied for the purchase of CFC, involved the *profits* of Shellef's scheme, as opposed to the expenses of carrying out the scheme.  *See Santos*, 128 S. Ct. at 2027 ("[A] criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid.  Defraying an activity's costs with its receipts simply will not be covered.").

on its papers.

Because Counts 46-50, 52-63, 65-68, 70-75, and 77-82 charge defendant with money laundering for engaging in the very same transactions in which he is charged with wire fraud, and because the evidence was insufficient to support the government's theory offered after trial regarding the origins of the proceeds used in those transactions, the Court grants defendant's motion for acquittal on these counts.

### b. Remaining Counts

Counts 51, 64, 69, 76, and 83-86, charge Shellef with engaging in financial transactions with the purpose of concealing the attributes of those funds under 18 U.S.C. § 1956(a)(1)(B)(i) and/or committing tax fraud under 18 U.S.C. § 1956(a)(1)(A)(ii). Defendant does not dispute that any of the transactions took place, but argues that the government failed to prove that Shellef engaged in these transactions with the requisite intent. For the reasons set forth below, the Court disagrees and concludes that, considering the whole record and viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to rationally find Shellef guilty of these money laundering counts.

### i. Purpose of the Transaction

The Supreme Court has recently emphasized that, in a prosecution for concealment money laundering, "*how* one moves the money is distinct from *why* one moves the money." *Cuellar v. United States*, 553 U.S. 550, 128 S. Ct. 1994, 2005 (2008) (emphasis in original); *see id.* at 2005 ("The statutory text makes clear . . . that a conviction under [18 U.S.C. § 1956(a)(2)(B)(i)] requires

proof that the purpose – not merely effect – of the transportation was to conceal or disguise a listed attribute."); *United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009) ("[A] showing that the defendant hid funds during transportation is not sufficient to support a conviction . . . even if substantial efforts have been expended to conceal the money." (citing *Cuellar*, 128 S. Ct. at 2003)). The Second Circuit has explained that "[a]lthough *Cuellar* arose in the context of transportation money laundering, we have found its holding equally applicable in the context of transaction money laundering . . . ." *United States v. Garcia*, 587 F.3d 509, 517 (2d Cir. 2009). Therefore, "a conviction for transaction money laundering . . . requires proof that the purpose or intended aim of the transaction was to conceal or disguise a specified attribute of the funds." *United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008), *cert. denied*, 130 S. Ct. (2009).[48] The government can prove such a design or purpose by circumstantial evidence. *See Cuellar*, 128 S. Ct. at 2005 n.8 ("[W]here the consequences of an action are commonly known, a trier of fact will often infer that the person taking the action knew what the consequences would be and acted with the purpose of bringing them about.").

### ii. Application

All of the remaining money laundering counts relate to transactions involving the proceeds of Shellef's domestic sales of Allied

---

[48] Although there does not appear to be any case law specifically addressing the requisite intent for a money laundering conviction under 18 U.S.C. § 1956(a)(1)(A)(ii), the Court applies the same standard as for concealment money laundering, *i.e.*, the government must prove that the purpose of the transaction, and not merely the effect, was to violate 18 U.S.C. § 7206.

CFC-113.[49] (*See* 1/14/10 Tr. 2077.) Count 51 involves the deposit of a cashier's check from All Discount Labs, one of Shellef's domestic customers of Allied CFC-113, into an account at North Fork Bank. (*See* Govt. Ex. 116; 1/12/10 Tr. 1749-50; 1/14/10 Tr. 2079.) Counts 64, 69, 76, and 83-86 involve transfers from Shellef's account at Commercial Bank of New York, which held the proceeds of Shellef's Allied CFC-113 domestic sales, to accounts held by Shellef in Switzerland and Israel. (*See, e.g.*, 1/14/10 Tr. 2082-86.) As set forth below, the evidence was sufficient for the jury to rationally find that defendant engaged in these transactions with the purpose of concealing the attributes of the funds involved and/or with the purpose of committing tax fraud.

As discussed *supra*, there was overwhelming evidence at trial that Shellef knew that excise tax applied to the domestic sales of Allied CFC-113, and he never paid the tax. (*See, e.g.*, 12/23/09 Tr. 1025; 1/5/10 Tr. 1169-71.) He deposited some of the proceeds from those sales into his North Fork Bank account, never disclosing to his accountant that he had such an account or that he had such income. (1/12/10 Tr. 1750.) In August 1999, Shellef specifically requested that All Discount Labs make payments directly to his account at Commercial Bank

(*see* 1/14/10 Tr. 2057-58); Shellef also never disclosed to his accountant that he had such income or that he had such an account. (1/12/10 Tr. 1751-52.) Shellef then made several transfers of funds from his Commercial Bank account to bank accounts he owned in Switzerland and Israel. (1/14/10 Tr. 2082-86.) Shellef never told his accountant that he had these foreign accounts, nor he did tell his accountant about these transfers.[50] (1/12/10 Tr. 1746-47.) Finally, Shellef did not report as income in the 1999 Poly Systems tax return any of the money involved in the above discussed transactions.[51] (*See* 1/12/10 Tr.

---

[49] The money involved in these transactions, which represented money received from domestic sales of Allied CFC-113 on which no excise tax had been paid, involved the "proceeds" of unlawful activity. *See United States v. Yusuf*, 536 F.3d 178, 189 (1st Cir. 2008) (discussing *Santos*, 128 S. Ct. 2020, and holding that "unpaid taxes, which are unlawfully disguised and retained by means of the filing of false tax returns through the U.S. mail, constitute 'proceeds' of mail fraud for purposes of supporting a charge of federal money laundering"), *cert. denied*, 129 S. Ct. 2764 (2009).

[50] Defendant argues that the evidence showed that Shellef's accountant, Kashinsky, was provided with a bank record that referenced the Swiss bank account. (1/12/10 Tr. 1797-99.) However, even if Shellef did give Kashinsky a record that referenced the Swiss account, the fact remains that he never told Kashinsky that he had such an account (*id.* at 1746-47) or that he had the Commercial Bank of New York account (*id.* at 1751-52) from which the Swiss account received funds. Any inconsistency in the witness's testimony was for the jury to decide, and, given the evidence discussed above, the jury could rationally find that Shellef engaged in the charged transactions with the purpose of concealing the funds and/or committing tax fraud.

[51] The Court recognizes that the mere fact that Shellef did not intend to report as income the money involved in these transactions does not by itself show that the purpose of the transactions themselves was to conceal the money and/or commit tax fraud. *See Garcia*, 587 F.3d at 519 ("Avoiding a paper trail, or declining to declare income, while perhaps frequently attendant to a broader purpose of concealment, no more demonstrates that the transfer and delivery were undertaken *in order to conceal* than does the mere fact of concealment during the transaction.") (emphasis added). However, the evidence in this case—in particular, the fact that Shellef transferred the proceeds of his own unlawful activity to accounts he did not tell his accountant about and

1751-52; 1/13/10 Tr. 1878-79.) Shellef admitted to his new accountant that "there were deposits that had been made into these overseas accounts that were not part of the original return." (1/13/10 Tr. 1879.)

Based on the above-referenced evidence, the jury could rationally find that Shellef engaged in the charged financial transactions with the purpose of concealing the proceeds of his unlawful activity and/or with the purpose of violating 18 U.S.C. § 7206, *i.e.*, filing a false tax return. *See Hassan*, 578 F.3d at 128 ("The evidence presented at trial was sufficient to sustain a conviction on [the money laundering conspiracy count] . . . . The money orders, unreported income, date books, and notebooks allowed the jury to infer that [defendant] agreed to conduct various financial transactions, knowing that the transactions were structured to disguise the nature and source of the funds involved.") (reversing conviction on other grounds); *Huezo*, 546 F.3d at 181 (affirming concealment money laundering conspiracy conviction where there was sufficient circumstantial evidence that the transactions were designed to conceal the proceeds of unlawful activity); *see also, e.g., United States v. Monea*, Nos. 08-3102, 08-3490, 2010 WL 1851313, at *7 (6th Cir. May 11, 2010) (holding, *inter alia*, that "[a] rational juror could infer an intent to conceal from [defendant's] routing the money through an extra step — the IOLTA account — not integral to the sale."); *United States v. Van Nguyen*, 602 F.3d 886, 902 (8th Cir. 2010) ("A reasonable jury could find [defendant] was putting cash into [his son's] account to hide its true source."); *United States v. Cedeno-Perez*, 579 F.3d 54, 61 (1st Cir. 2009) ("A rational jury could have concluded that [defendant], in agreeing to carry out a financial transaction with [a coconspirator], engaged in conduct that was commonly known to conceal the nature, location, source, ownership, or control of the proceeds."), *cert. denied*, 130 S. Ct. 1091 (2010); *United States v. Upton*, 559 F.3d 3, 11-12 (1st Cir. 2009) ("[T]he jury reasonably could have found that [defendant's] failure to file the 1999 return was in furtherance of the central objective of the conspiracy. Specifically, the jury supportably could have concluded that the failure to file his 1999 return in the ordinary course facilitated the concealment aim of the money laundering transactions."), *cert. denied*, 130 S. Ct. 397 (2009); *United States v. Alberico*, 559 F.3d 24, 28 (1st Cir. 2009), *cert. denied*, 130 S. Ct. 395 (2009); *United States v. Suba*, 132 F.3d 662, 676 (11th Cir. 1998) ("As [defendant] did not report these three checks on his income tax return, the jury's conclusion that [defendant] laundered these . . . monies is supported by a reasonable construction of the evidence.") (affirming convictions under 18 U.S.C. §§ 1956(a)(1)(A)(ii) and (a)(1)(B)(i)); *accord United States v. Manuel-Santiago*, 562 F.3d 411, 429 (1st Cir. 2009) ("[Defendant's] financial activity, coupled with his failure to report his income, is indicative of an intent to conceal funds, which is relevant evidence in establishing the existence of, and [defendant's] participation in, a money laundering conspiracy." (collecting cases)), *cert. denied*, 130 S. Ct. 293 (2009).

Defendant argues primarily that the money laundering convictions cannot stand in light of the Supreme Court's decision in *Cuellar*, 128 S. Ct. 1994, and the Second Circuit's decision in *Ness*, 565 F.3d 73. However, in this case, there was sufficient circumstantial evidence as

---

then did not report that money as income—was sufficient to show that Shellef engaged in the transactions with the purpose of concealing the money and committing tax fraud.

to *why* Shellef engaged in the transactions—namely, to conceal the proceeds of his domestic sales of Allied CFC-113 and to commit tax fraud by filing a false tax return that did not report as income any of the money involved in the charged transactions.[52] Defendant also argues that the evidence was inconsistent with an intent to engage in the transactions in order to conceal the money and/or commit tax fraud. For instance, defendant points out that the transactions did not involve fictitious names or false tax identification numbers. (Def.'s Br. at 53.) However, such specific acts are not required for a concealment money laundering conviction. *See, e.g.*, *United States v. Szur*, No. S5 97 CR 108 (JGK), 1998 WL 661484, at *3 (S.D.N.Y. Sept. 24, 1998) ("[T]he fact that [defendant] registered Optimum Trading with the Internal Revenue Service, paid taxes in its name, and signed checks from the Optimum Trading account does not indicate that he did not intend to use the Optimum Trading account as part of a transaction designed to conceal the nature, source, ownership or control of the proceeds of the wire fraud." (citing *United States v. Kinzler*, 55 F.3d 70, 73 (2d Cir. 1995))). Defendant also argues that the mere fact that Shellef made transfers to overseas accounts, particularly given his Israeli citizenship, does not indicate the requisite concealment or tax fraud purpose. (Def.'s Br. at 53.) The Court agrees with that general proposition, but concludes that, in light of all of the evidence discussed above, the jury could rationally find that Shellef had the requisite intent in this case.[53]

\*\*\*

In short, because there was insufficient evidence that the transactions in Counts 46-50, 52-63, 65-68, 70-75, and 77-82 involved the proceeds of unlawful activity, the Court grants defendant's motion for a judgment of acquittal on these counts. The evidence was sufficient, however, to support the jury's verdict on Counts 51, 64, 69, 76, and 83-86. Specifically, there was sufficient evidence that defendant engaged in the charged transactions with the purpose of concealing the money and committing tax fraud. Thus, defendant's motion for acquittal and/or a new trial as to these counts is denied.[54]

---

[52] Defendant also cites *United States v. Roberts*, 650 F. Supp. 2d 219 (E.D.N.Y. 2009), in which the defendant was charged with concealment money laundering for transporting money to Jamaica. The court held: "The evidence adduced by the government is pertinent to a determination of 'how' the money was moved—secreted in a black plastic bag, apparently surreptitiously loaded by defendant onto a Jamaica-bound flight. It does not prove that his purpose in transporting the narcotics proceeds was concealing the nature, location, or source of the proceeds. There is no testimony that [defendant] ever looked inside the bag. Moreover, [a coconspirator] testified that, once the money reached its destination, it would be retrieved 'to pay for drugs or buy more drugs.'" *Id.* at 222 (citing *Cuellar*, 128 S. Ct. at 2005, and *Ness*, 565 F.3d at 77-78). However, as discussed above, there was sufficient evidence in this case to show that Shellef engaged in the transactions with the purpose of concealing the funds and committing tax fraud.

[53] Defendant also raises some of the same arguments already discussed in connection with Count Two. For instance, defendant argues that he filed an amended tax return and that his accountant should have known about the undisclosed accounts. The Court rejects these arguments for the same reasons discussed *supra*.

[54] Because the Court concludes that the evidence was sufficient to support the jury's verdict on Counts 51, 64, 69, 76, and 83-86 under either theory, *i.e.*, concealment or tax fraud, the Court rejects defendant's argument that there is no way of

### E. Alleged Errors at Trial

Defendant argues that several alleged errors at trial warrant granting his motion for a new trial under Rule 33. For the reasons set forth below, the Court rejects all of defendant's arguments.

### 1. 404(b) Evidence

At trial, the government introduced, over defendant's objection, evidence that Shellef had engaged in "other bad acts" bearing on his intent in this case. Specifically, the government offered evidence that Shellef worked with Rubenstein to defraud two other companies, 3M and Raychem, by purchasing products for a lower price under the pretense that he would export the products; Shellef then sold those products to domestic customers while keeping the profits. (*See, e.g.*, 12/23/09 Tr. 1003-20.) The government also introduced evidence that Shellef had defrauded the Government of Israel by using aliases and by falsely labeling virgin CFC-113 as reclaimed. (12/23/09 Tr. 949-50, 1046-75; Govt. Exs. 9, 15-A, 16, 18, 20-A, 21, 22, 40, 41, 52, 53.) Defendant argues that this evidence was confusing to the jury and unfairly prejudicial.

Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

> opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b); *see also United States v. Germose*, 139 F.3d 120, 127 (2d Cir. 1998) ("We take an 'inclusive approach' to 'other acts' evidence: it can be admitted 'for any purpose except to show criminal propensity, unless the trial judge concludes that its probative value is substantially outweighed by its potential for unfair prejudice.'" (citations omitted)).

In this case, as discussed in great detail by the Court during its oral rulings on this issue both pre-trial and during the trial, the other acts evidence offered by the government was relevant to proving intent, motive, and absence of mistake or accident by Shellef in this case. The Court concluded that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice or jury confusion. *See* Fed. R. Evid. 403. The Court also repeatedly instructed the jury on the limited purpose for which this evidence could be considered. (*See, e.g.*, 12/23/09 Tr. 1078-79; 1/21/10 Tr. 2502-03.) Thus, the Court rejects defendant's argument that the evidence was improperly admitted.

The Court also rejects defendant's argument that the government's reliance on this evidence during summation warrants a new trial. As a threshold matter, defendant did not object to any of the statements alleged to be improper during the government's summation. Furthermore, the government's arguments were permissible commentary on the limited purpose for the evidence. Indeed, government counsel reminded the jury of the limited purpose of the evidence. (*See, e.g.*, 1/20/10 Tr. 2238.) In its jury instructions, the Court reminded the jury again that the other

knowing under which theory the jury found defendant guilty and that a new trial is needed under Rule 33.

acts evidence was offered for a limited purpose. Thus, the Court concludes that the government's reliance on the evidence in its summation does not warrant a new trial. *See United States v. Parkes*, 497 F.3d 220, 234 (2d Cir. 2007) ("[The] challenged statements were isolated. '[I]solated remarks are ordinarily insufficient [to warrant reversal].' Defense counsel had adequate opportunity in his summation to dispute the government's assertions . . . . In any event, the judge's instructions to the jury . . . cured any possible prejudice." (citations omitted)).

### 2. Business Relationship of Shellef and Rubenstein

Defendant argues that evidence about the continued business relationship of Shellef and Rubestein was unfairly prejudicial. For instance, Rubenstein testified that the two men remain "business associates," share office space, and still shake hands. (12/23/09 Tr. 1032-33.) The government argued that if Rubenstein were actually lying about Shellef's involvement in the charged crimes, as defendant suggested, then the two would not have continued their business relationship. (*See* 1/20/10 Tr. 2210, 2272; 1/21/10 Tr. 2459, 2460.) Defendant did not object to this testimony or to these arguments at trial.[55] The Court concludes that the probative value of this evidence, which tended to rebut

---

[55] At trial, defense counsel objected to a question regarding whether Shellef had made a gesture toward Rubenstein at trial, and the Court sustained the objection. (12/23/09 Tr. 1033-34.) At side bar, it was explained that the gesture in question was a wink. Defense counsel did not request a limiting instruction, and the government did not return to the question. (*Id.* at 1033-1042.) Defendant does not raise this issue in the instant motion.

defendant's argument that the witness was fabricating testimony, and the government's argument to that effect were not unfairly prejudicial under Rule 403 and, in any event, would not provide grounds for a new trial.

### 3. Shellef's 2003 Charge

Defendant argues that admission of the fact that Shellef was charged along with Rubenstein in 2003 for the same crimes charged in this case was irrelevant and prejudicial, warranting a new trial. For the reasons set forth below, the Court disagrees. As a threshold matter, the Court notes that both the Court and the attorneys took great care in ensuring that no references were made to the fact that Shellef had been previously tried and convicted with Rubenstein, and that the convictions were overturned on appeal. Thus, no references were made to any prior trial involving Shellef. As discussed below, this task was complicated by the fact that defense counsel, in order to challenge the credibility of coconspirator Rubenstein, wanted to bring out before the jury that Rubenstein only began cooperating after he was tried and convicted and his conviction was overturned on appeal. The Court, over the government's objection, allowed such questioning by the defense, while again carefully ensuring that no reference was made to any prior trial involving Shellef. However, because defense counsel was implying that no case or charge against Shellef existed prior to Rubenstein's cooperation, the Court made clear that, if defense counsel was going to pursue this line of questioning, the government would be allowed to rebut that misleading impression by establishing that Shellef was charged prior to Rubenstein's cooperation, but the government still could not reference any prior trial involving Shellef. Defense counsel understood that he was opening the door to that question and did not object. As discussed

below, the Court's ruling was correct and not unfairly prejudicial to the defendant.

On cross-examination of Rubenstein, defendant sought to introduce the fact of Rubenstein's earlier charge and conviction to attack his credibility, specifically, that Rubenstein "reached the position that he's testifying to [at trial] after nine years of litigation where he had taken quite a different position during most of that time period up until the time that he signed the cooperation agreement with the government." (12/22/09 Tr. 908.) In other words, defendant made an issue of the timing of Rubenstein's cooperation with the government—*i.e.*, suggesting that the government needed Rubenstein's testimony to prosecute Shellef, and, therefore, Rubenstein had a motive to fabricate his testimony in order to obtain a favorable plea deal. The Court allowed defendant to question Rubenstein about this issue over the government's objection.

The Court also allowed the government to attempt to rebut defendant's argument on this point, by eliciting testimony from Rubenstein that Shellef had already been charged when Rubenstein decided to cooperate with the government. (*See* 12/22/09 Tr. 912-13.) The government presented the Court with a list of eleven proposed questions for the witness on this point. (*See* 12/23/09 Tr. 919-21; Court Exhibit J.) Defense counsel had no objection to the first ten questions, but did object to the eleventh proposed question, which the Court prohibited the government from asking. (*Id.* at 920.) The Court emphasized that the government was not to elicit testimony that Shellef was already tried or convicted. The Court also specifically instructed Rubenstein, outside the presence of the jury, that Rubenstein was not to refer to the fact that he and Shellef had been tried together. (*Id.* at

921-23.)

On cross-examination, defense counsel questioned Rubenstein about his 2003 indictment.

Q. [I]n 2003, you were indicted on a federal indictment. Correct?

A. That's correct.

Q. Charging you with almost 50 felony counts, right?

A. That's correct.

Q. Involving fraud related to the domestic sales of AlliedSignal's CFC-113?

A. Well, conspiracy and wire fraud, yes.

Q. Okay. One count of conspiracy, along with Mr. Shellef as your charged coconspirator, to evade federal excise taxes. Correct?

A. That's correct.

(1/5/10 Tr. 1185-86.) On re-direct, government counsel engaged in the following colloquy with Rubestein:

Q. What year were you first charged?

A. I think it was late 2002 or early 2003.

Q. I believe you were asked this question on cross-examination. Was anybody charged with you in either late 2002 or early 2003?

Mr. Mazurek: Objection.

39

The Court: I'll allow this last question, and then move on. This has all been covered.

. . .

Q. When you were charged in late 2002 or early 2003, was anybody else charged?

A. Yes.

Q. Who?

A. Mr. Shellef

(1/7/10 Tr. 1365.)

Defendant argues that the admission of this fact during the government's re-direct warrants a new trial. The Court rejects defendant's argument. As a threshold matter, the government did not go beyond the parameters of the Court's instructions on this issue.[56] The Court had ruled that, although the government could not refer to the fact that Shellef had been *tried* with Rubenstein, the government could refer to the fact that Shellef was *charged* along with Rubenstein to rebut the suggestion by defendant that the government offered the cooperation agreement to Rubenstein in order to obtain evidence for charging Shellef. Thus, the

timing of the charge was probative of the government's motives in offering a cooperation agreement to Rubenstein. (12/22/09 Tr. 912-13.) Without any reference to Shellef's trial or conviction, this evidence was not unfairly prejudicial under Rule 403. In any event, as discussed above, it was defendant who first introduced the fact that Shellef was charged along with Rubestein in 2003. (1/5/10 Tr. 1185-86.)

Thus, the admission of the fact that Shellef was charged along with Rubenstein in 2003 did not result in a miscarriage of justice and, therefore, does not warrant a new trial under Rule 33.

### 4. Chain of Custody

Defendant also contends that it was error to admit certain documentary evidence, over defendant's objection, that was obtained from searches at the Bayonne warehouse and Shellef's residence. However, the Court permitted defense counsel to conduct a voir dire of the government witness (1/13/10 Tr. 1952-88), who testified about how the evidence was obtained and the chain of custody, and ruled that the evidence was admissible because the government had met its burden under Rule 901 of the Federal Rules of Evidence. (*Id.* at 1988-89.) Specifically, the government showed that there was a rational basis for concluding that the exhibits were what they purported to be. (*Id.* at 2016-18.) Any breaks in the chain of custody merely went to the weight of the evidence for the jury to consider. *See Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2532 n.1 (2009) ("'[G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.'" (quoting *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988))); *United States v. Jackson*, 345 F.3d 59,

---

[56] The Court had specifically allowed the government to ask: "Was the Defendant charged with a crime prior to your signing this plea agreement on February 10, 2009?" (Court Exhibit J, Question 10; 12/23/09 Tr. 919-21.) Defendant did not object to this question, stating that it was "fine." (12/23/09 Tr. 920.) Although the question actually asked by the government was slightly different, the question as it was asked was not unfairly prejudicial under Rule 403 for the reasons discussed above.

65 (2d Cir. 2003) ("The government need not 'rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be.' . . . 'Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence.'" (quotations omitted)); *see also United States v. Morrison*, 153 F.3d 34, 56-57 (2d Cir. 1998); *United States v. Hon*, 904 F.2d 803, 809-10 (2d Cir. 1990). The Court concludes that the evidence was properly admitted and that, as the jury was instructed, any breaks in the chain of custody were issues for the jury to consider in its assessment of the evidence. (*See* 1/21/10 Tr. 2502.) Thus, the Court rejects defendant's argument.

### 5. Jury Instruction on Tax Export Regulations

Defendant argues that it was error for the Court not to instruct the jury, in connection with the conspiracy charged in Count One, about the relevant tax export regulation, 26 C.F.R. § 52.4682-5. As discussed above, defendant spent a considerable amount of time at trial arguing that Allied Signal did not follow the procedural requirements for qualifying the sales of CFC-113 for export. The Court ruled that any failure by Allied to comply with the excise tax regulations was irrelevant to a determination of defendant's guilt on the conspiracy charged in Count One. As the Second Circuit explained on the prior appeal, "a defendant need not have a duty to report transactions or pay taxes to be convicted of a conspiracy to defraud the IRS with respect to those reports or payments." *Shellef*, 507 F.3d at 105. Upon defendant's request, the Court instructed the jury that there are certain procedural requirements with respect to the export tax exemption, but that these requirements are relevant only to

considering defendant's specific intent and the credibility of Allied Signal witnesses. (*See* 1/21/10 Tr. 2504-05.) The Court concludes that no additional instruction on this issue was necessary and rejects defendant's argument that this instruction should have been included in the specific instructions on the conspiracy count.

### 6. Indictment

Finally, defendant objects to the Court's allowing a redacted copy of the Indictment to go back to the jury room. However, it is well settled that whether to allow the jury to have a copy of the indictment is a matter of discretion for the district court. *See United States v. Giampino*, 680 F.2d 898, 901 n.3 (2d Cir. 1982) ("[T]he trial court's permitting the jury to take a copy of the indictment into the jury room, after taking care to instruct the jury that the indictment was not to be considered evidence, was not an abuse of discretion." (citing *United States v. Press*, 336 F.2d 1003, 1016 (2d Cir. 1964))); *see also United States v. Skerret-Ortega*, 529 F.3d 33, 38 (1st Cir. 2008); *United States v. Roy*, 473 F.3d 1232, 1237 (D.C. Cir. 2007); *United States v. Scott*, 37 F.3d 1564, 1576 (10th Cir. 1994). Given the number of counts in the indictment and the complex scheme with which defendant was charged, it was appropriate for the jury to have a copy of the Indictment in order to facilitate deliberation. The Court repeatedly instructed the jury that the Indictment contained allegations and that the Indictment was not evidence. (*See*, *e.g.*, 1/21/10 Tr. 2481-82, 2484, 2507, 2509.) Thus, the Court rejects defendant's argument that a new trial is needed on this ground.

\*\*\*

In sum, the Court concludes that none of

the alleged errors, whether considered individually or collectively, resulted in a miscarriage of justice so as to warrant a new trial under Rule 33.

## IV. CONCLUSION

For the foregoing reasons, the Rule 29 motion for a judgment of acquittal is granted in part and denied in part. Specifically, the motion for acquittal is granted on Counts 46-50, 52-63, 65-68, 70-75, and 77-82. Accordingly, the convictions on those counts are vacated and a judgment of acquittal shall be entered on those counts. The motion for acquittal is denied in all other respects. The Rule 33 motion for a new trial is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 5, 2010
Central Islip, New York

* * *

The attorneys for the Government are James B. Nelson and Mark W. Kotila, United States Department of Justice, 601 D St. NW, Washington, DC 20004. The attorneys for the defendant are Henry E. Mazurek, Weinstein & Mazurek PLLC, 521 Fifth Ave., Suite 3300, New York, NY 10175, and Jane Anne Murray, Law Office of Jane Anne Murray, Woolworth Building, 233 Broadway, 22nd Floor, New York, NY 10279.